# DEPARTMENT OF TRANSPORTATION ET AL. *v.*
# PUBLIC CITIZEN ET AL.

No. 03–358.  Argued April 21, 2004—Decided June 7, 2004

754

*Deputy Solicitor General Kneedler* argued the cause for petitioners. With him on the briefs were *Solicitor General Olson, Assistant Attorney General Sansonetti, Deputy Solicitor General Hungar, Deputy Assistant Attorney General Clark, Austin C. Schlick, John L. Smeltzer, David C. Shilton, Jeffrey A. Rosen,* and *Peter J. Plocki.*

*Jonathan Weissglass* argued the cause for respondents. With him on the brief were *Stephen P. Berzon, Gail Ruderman Feuer, Julie Masters, Adrianna Quintero Somaini, Melissa Lin Perrella, David C. Vladeck, Patrick J. Szymanski, David Rosenfeld, William S. Lerach, Patrick J. Coughlin, Albert H. Meyerhoff,* and *Thomas O. McGarity.*[*]

---

[*]Briefs of *amici curiae* urging affirmance were filed for the State of California et al. by *Bill Lockyer,* Attorney General of California, *Susan L. Durbin* and *Gordon B. Burns,* Deputy Attorneys General, *Manuel M. Medeiros,* Solicitor General, *Tom Greene,* Chief Assistant Attorney General, *Theodora Berger,* Senior Assistant Attorney General, and *Craig C. Thompson,* Supervising Deputy Attorney General, and by the Attorneys General for their respective States as follows: *Terry Goddard* of Arizona, *Lisa Madigan* of Illinois, *Thomas F. Reilly* of Massachusetts, *Patricia A. Madrid* of New Mexico, *W. A. Drew Edmondson* of Oklahoma, *Hardy Myers* of Oregon, *Christine O. Gregoire* of Washington, and *Peggy A. Lautenschlager* of Wisconsin; for the American Public Health Associa-

JUSTICE THOMAS delivered the opinion of the Court.

In this case, we confront the question whether the National Environmental Policy Act of 1969 (NEPA), 83 Stat. 852 (codified, as amended, at 42 U. S. C. §§ 4321–4370f), and the Clean Air Act (CAA), 42 U. S. C. §§ 7401–7671q, require the Federal Motor Carrier Safety Administration (FMCSA) to evaluate the environmental effects of cross-border operations of Mexican-domiciled motor carriers, where FMCSA's promulgation of certain regulations would allow such cross-border operations to occur. Because FMCSA lacks discretion to prevent these cross-border operations, we conclude that these statutes impose no such requirement on FMCSA.

## I

Due to the complex statutory and regulatory provisions implicated in this case, we begin with a brief overview of the relevant statutes. We then turn to the factual and procedural background.

### A

#### 1

Signed into law on January 1, 1970, NEPA establishes a "national policy [to] encourage productive and enjoyable harmony between man and his environment," and was intended to reduce or eliminate environmental damage and to promote "the understanding of the ecological systems and natural resources important to" the United States. 42 U. S. C. § 4321. "NEPA itself does not mandate particular results" in order to accomplish these ends. *Robertson* v. *Methow Valley Citizens Council*, 490 U. S. 332, 350 (1989). Rather, NEPA imposes only procedural requirements on federal agencies with a particular focus on requiring agencies to undertake anal-

tion et al. by *Hope M. Babcock;* for Defenders of Wildlife et al. by *Pamela S. Karlan* and *Sanjay Narayan;* for the Eagle Forum Education & Legal Defense Fund by *Karen B. Tripp;* and for South Coast Air Quality Management District et al. by *Barbara Baird* and *Patricia V. Tubert.*

yses of the environmental impact of their proposals and actions. See *id.*, at 349–350. At the heart of NEPA is a requirement that federal agencies

"include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

"(i) the environmental impact of the proposed action,

"(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

"(iii) alternatives to the proposed action,

"(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

"(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U. S. C. § 4332(2)(C).

This detailed statement is called an Environmental Impact Statement (EIS). The Council of Environmental Quality (CEQ), established by NEPA with authority to issue regulations interpreting it, has promulgated regulations to guide federal agencies in determining what actions are subject to that statutory requirement. See 40 CFR § 1500.3 (2003). The CEQ regulations allow an agency to prepare a more limited document, an Environmental Assessment (EA), if the agency's proposed action neither is categorically excluded from the requirement to produce an EIS nor would clearly require the production of an EIS. See §§ 1501.4(a)–(b). The EA is to be a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS]." § 1508.9(a). If, pursuant to the EA, an agency determines that an EIS is not required under applicable CEQ regulations, it must issue a "finding of no significant impact" (FONSI), which briefly presents

the reasons why the proposed agency action will not have a significant impact on the human environment. See §§ 1501.4(e), 1508.13.

2

What is known as the CAA became law in 1963, 77 Stat. 392. In 1970, Congress substantially amended the CAA into roughly its current form. 84 Stat. 1713. The 1970 amendments mandated national air quality standards and deadlines for their attainment, while leaving to the States the development of "implementation plan[s]" to comply with the federal standards. *Ibid.*

In 1977, Congress again amended the CAA, 91 Stat. 749, to prohibit the Federal Government and its agencies from "engag[ing] in, support[ing] in any way or provid[ing] financial assistance for, licens[ing] or permit[ting], or approv[ing], any activity which does not conform to [a state] implementation plan." 42 U. S. C. § 7506(c)(1). The definition of "conformity" includes restrictions on, for instance, "increas[ing] the frequency or severity of any existing violation of any standard in any area," or "delay[ing] timely attainment of any standard . . . in any area." § 7506(c)(1)(B). These safeguards prevent the Federal Government from interfering with the States' abilities to comply with the CAA's requirements.

3

FMCSA, an agency within the Department of Transportation (DOT), is responsible for motor carrier safety and registration. See 49 U. S. C. § 113(f). FMCSA has a variety of statutory mandates, including "ensur[ing]" safety, § 31136, establishing minimum levels of financial responsibility for motor carriers, § 31139, and prescribing federal standards for safety inspections of commercial motor vehicles, § 31142. Importantly, FMCSA has only limited discretion regarding motor vehicle carrier registration: It must grant registration to all domestic or foreign motor carriers

that are "willing and able to comply with" the applicable safety, fitness, and financial-responsibility requirements. § 13902(a)(1). FMCSA has no statutory authority to impose or enforce emissions controls or to establish environmental requirements unrelated to motor carrier safety.

### B

We now turn to the factual and procedural background of this case. Before 1982, motor carriers domiciled in Canada and Mexico could obtain certification to operate within the United States from the Interstate Commerce Commission (ICC).[1] In 1982, Congress, concerned about discriminatory treatment of United States motor carriers in Mexico and Canada, enacted a 2-year moratorium on new grants of operating authority. Congress authorized the President to extend the moratorium beyond the 2-year period if Canada or Mexico continued to interfere with United States motor carriers, and also authorized the President to lift or modify the moratorium if he determined that doing so was in the national interest. 49 U. S. C. § 10922(l) (1982 ed.). Although the moratorium on Canadian motor carriers was quickly lifted, the moratorium on Mexican motor carriers remained, and was extended by the President.

In December 1992, the leaders of Mexico, Canada, and the United States signed the North American Free Trade Agreement (NAFTA), 32 I. L. M. 605 (1993). As part of NAFTA, the United States agreed to phase out the moratorium and permit Mexican motor carriers to obtain operating authority within the United States' interior by January 2000. On NAFTA's effective date (January 1, 1994), the President began to lift the trade moratorium by allowing the licensing

---

[1] In 1995, Congress abolished the ICC and transferred most of its responsibilities to the Secretary of Transportation. See ICC Termination Act of 1995, § 101, 109 Stat. 803. In 1999, Congress transferred responsibility for motor carrier safety within DOT to the newly created FMCSA. See Motor Carrier Safety Improvement Act of 1999, 113 Stat. 1748.

of Mexican carriers to provide some bus services in the United States. The President, however, did not continue to ease the moratorium on the timetable specified by NAFTA, as concerns about the adequacy of Mexico's regulation of motor carrier safety remained.

The Government of Mexico challenged the United States' implementation of NAFTA's motor carrier provisions under NAFTA's dispute-resolution process, and in February 2001, an international arbitration panel determined that the United States' "blanket refusal" of Mexican motor carrier applications breached the United States' obligations under NAFTA. App. 279, ¶ 295. Shortly thereafter, the President made clear his intention to lift the moratorium on Mexican motor carrier certification following the preparation of new regulations governing grants of operating authority to Mexican motor carriers.

In May 2001, FMCSA published for comment proposed rules concerning safety regulation of Mexican motor carriers. One rule (the Application Rule) addressed the establishment of a new application form for Mexican motor carriers that seek authorization to operate within the United States. Another rule (the Safety Monitoring Rule) addressed the establishment of a safety-inspection regime for all Mexican motor carriers that would receive operating authority under the Application Rule.

In December 2001, Congress enacted the Department of Transportation and Related Agencies Appropriations Act, 2002, 115 Stat. 833. Section 350 of this Act, id., at 864, provided that no funds appropriated under the Act could be obligated or expended to review or to process any application by a Mexican motor carrier for authority to operate in the interior of the United States until FMCSA implemented specific application and safety-monitoring requirements for Mexican carriers. Some of these requirements went beyond those proposed by FMCSA in the Application and Safety

Monitoring Rules. Congress extended the § 350 conditions to appropriations for Fiscal Years 2003 and 2004.

In January 2002, acting pursuant to NEPA's mandates, FMCSA issued a programmatic EA for the proposed Application and Safety Monitoring Rules. FMCSA's EA evaluated the environmental impact associated with three separate scenarios: where the President did not lift the moratorium; where the President did but where (contrary to what was legally possible) FMCSA did not issue any new regulations; and the Proposed Action Alternative, where the President would modify the moratorium and where FMCSA would adopt the proposed regulations. The EA considered the environmental impact in the categories of traffic and congestion, public safety and health, air quality, noise, socioeconomic factors, and environmental justice. Vital to the EA's analysis, however, was the assumption that there would be no change in trade volume between the United States and Mexico due to the issuance of the regulations. FMCSA did note that § 350's restrictions made it impossible for Mexican motor carriers to operate in the interior of the United States before FMCSA's issuance of the regulations. But, FMCSA determined that "this and any other associated effects in trade characteristics would be the result of the modification of the moratorium" by the President, not a result of FMCSA's implementation of the proposed safety regulations. App. 60. Because FMCSA concluded that the entry of the Mexican trucks was not an "effect" of its regulations, it did not consider any environmental impact that might be caused by the increased presence of Mexican trucks within the United States.

The particular environmental effects on which the EA focused, then, were those likely to arise from the increase in the number of roadside inspections of Mexican trucks and buses due to the proposed regulations. The EA concluded that these effects (such as a slight increase in emissions, noise from the trucks, and possible danger to passing motor-

ists) were minor and could be addressed and avoided in the inspections process itself. The EA also noted that the increase of inspection-related emissions would be at least partially offset by the fact that the safety requirements would reduce the number of Mexican trucks operating in the United States. Due to these calculations, the EA concluded that the issuance of the proposed regulations would have no sig- ·nificant impact on the environment, and hence FMCSA, on the same day as it released the EA, issued a FONSI.

On March 19, 2002, FMCSA issued the two interim rules, delaying their effective date until May 3, 2002, to allow public comment on provisions that FMCSA added to satisfy the requirements of § 350. In the regulatory preambles, FMCSA relied on its EA and its FONSI to demonstrate compliance with NEPA. FMCSA also addressed the CAA in the preambles, determining that it did not need to perform a "conformity review" of the proposed regulations under 42 U. S. C. § 7506(c)(1) because the increase in emissions from these regulations would fall below the Environmental Protection Agency's (EPA) threshold levels needed to trigger such a review.

In November 2002, the President lifted the moratorium on qualified Mexican motor carriers. Before this action, however, respondents filed petitions for judicial review of the Application and Safety Monitoring Rules, arguing that the rules were promulgated in violation of NEPA and the CAA. The Court of Appeals agreed with respondents, granted the petitions, and set aside the rules. 316 F. 3d 1002 (CA9 2003).

The Court of Appeals concluded that the EA was deficient because it failed to give adequate consideration to the overall environmental impact of lifting the moratorium on the cross-border operation of Mexican motor carriers. According to the Court of Appeals, FMCSA was required to consider the environmental effects of the entry of Mexican trucks because "the President's rescission of the moratorium was 'reasonably foreseeable' at the time the EA was pre-

pared and the decision not to prepare an EIS was made."
*Id.*, at 1022 (quoting 40 CFR §§ 1508.7, 1508.8(b) (2003)).
Due to this perceived deficiency, the Court of Appeals remanded the case for preparation of a full EIS.

The Court of Appeals also directed FMCSA to prepare a full CAA conformity determination for the challenged regulations. It concluded that FMCSA's determination that emissions attributable to the challenged rules would be below the threshold levels was not reliable because the agency's CAA determination reflected the "illusory distinction between the effects of the regulations themselves and the effects of the presidential rescission of the moratorium on Mexican truck entry." 316 F. 3d, at 1030.

We granted certiorari, 540 U. S. 1088 (2003), and now reverse.

## II

An agency's decision not to prepare an EIS can be set aside only upon a showing that it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U. S. C. § 706(2)(A). See also *Marsh* v. *Oregon Natural Resources Council*, 490 U. S. 360, 375–376 (1989); *Kleppe* v. *Sierra Club*, 427 U. S. 390, 412 (1976). Here, FMCSA based its FONSI upon the analysis contained within its EA; respondents argue that the issuance of the FONSI was arbitrary and capricious because the EA's analysis was flawed. In particular, respondents criticize the EA's failure to take into account the various environmental effects caused by the increase in cross-border operations of Mexican motor carriers.

Under NEPA, an agency is required to provide an EIS only if it will be undertaking a "major Federal actio[n]," which "significantly affect[s] the quality of the human environment." 42 U. S. C. § 4332(2)(C). Under applicable CEQ regulations, "[m]ajor Federal action" is defined to "includ[e] actions with effects that may be major and which are potentially subject to Federal control and responsibility." 40

CFR § 1508.18 (2003). "Effects" is defined to "include: (a) Direct effects, which are caused by the action and occur at the same time and place," and "(b) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." § 1508.8. Thus, the relevant question is whether the increase in cross-border operations of Mexican motor carriers, with the correlative release of emissions by Mexican trucks, is an "effect" of FMCSA's issuance of the Application and Safety Monitoring Rules; if not, FMCSA's failure to address these effects in its EA did not violate NEPA, and so FMCSA's issuance of a FONSI cannot be arbitrary and capricious.

A

To answer this question, we begin by explaining what this case does *not* involve. What is not properly before us, despite respondents' argument to the contrary, see Brief for Respondents 38–41, is any challenge to the EA due to its failure properly to consider possible alternatives to the proposed action (*i. e.*, the issuance of the challenged rules) that would mitigate the environmental impact of the authorization of cross-border operations by Mexican motor carriers. Persons challenging an agency's compliance with NEPA must "structure their participation so that it . . . alerts the agency to the [parties'] position and contentions," in order to allow the agency to give the issue meaningful consideration. *Vermont Yankee Nuclear Power Corp.* v. *Natural Resources Defense Council, Inc.,* 435 U. S. 519, 553 (1978). None of the respondents identified in their comments any rulemaking alternatives beyond those evaluated in the EA, and none urged FMCSA to consider alternatives. Because respondents did not raise these particular objections to the EA, FMCSA was not given the opportunity to examine any proposed alternatives to determine if they were reasonably available. Respondents have therefore forfeited any objec-

tion to the EA on the ground that it failed adequately to discuss potential alternatives to the proposed action.

Admittedly, the agency bears the primary responsibility to ensure that it complies with NEPA, see *ibid.*, and an EA's or an EIS' flaws might be so obvious that there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a proposed action. But that situation is not before us. With respect to FMCSA's ability to mitigate, respondents can argue only that FMCSA could regulate emissions from Mexican trucks indirectly, through making the safety-registration process more onerous or by removing older, more polluting trucks through more effective enforcement of motor carrier safety standards. But respondents fail to identify any evidence that shows that any effect from these possible actions would be significant, or even noticeable, for air-quality purposes. The connection between enforcement of motor carrier safety and the environmental harms alleged in this case is also tenuous at best. Nor is it clear that FMCSA could, consistent with its limited statutory mandates, reasonably impose on Mexican carriers standards beyond those already required in its proposed regulations.

## B

With this point aside, respondents have only one complaint with respect to the EA: It did not take into account the environmental effects of increased cross-border operations of Mexican motor carriers. Respondents' argument that FMCSA was required to consider these effects is simple. Under § 350, FMCSA is barred from expending any funds to process or review any applications by Mexican motor carriers until FMCSA implemented a variety of specific application and safety-monitoring requirements for Mexican carriers. This expenditure bar makes it impossible for any Mexican motor carrier to receive authorization to operate within the United States until FMCSA issued the regulations challenged here. The promulgation of the regulations,

the argument goes, would "caus[e]" the entry of Mexican trucks (and hence also cause any emissions such trucks would produce), and the entry of the trucks is "reasonably foreseeable." 40 CFR § 1508.8 (2003). Thus, the argument concludes, under the relevant CEQ regulations, FMCSA must take these emissions into account in its EA when evaluating whether to produce an EIS.

Respondents' argument, however, overlooks a critical feature of this case: FMCSA has no ability to countermand the President's lifting of the moratorium or otherwise categorically to exclude Mexican motor carriers from operating within the United States. To be sure, § 350 did restrict the ability of FMCSA to authorize cross-border operations of Mexican motor carriers, but Congress did not otherwise modify FMCSA's statutory mandates. In particular, FMCSA remains subject to the mandate of 49 U. S. C. § 13902(a)(1), that FMCSA "*shall* register a person to provide transportation . . . as a motor carrier if [it] finds that the person is willing and able to comply with" the safety and financial responsibility requirements established by DOT. (Emphasis added.) Under FMCSA's entirely reasonable reading of this provision, it must certify *any* motor carrier that can show that it is willing and able to comply with the various substantive requirements for safety and financial responsibility contained in DOT regulations; only the moratorium prevented it from doing so for Mexican motor carriers before 2001. App. 51–55. Thus, upon the lifting of the moratorium, if FMCSA refused to authorize a Mexican motor carrier for cross-border services, where the Mexican motor carrier was willing and able to comply with the various substantive safety and financial responsibilities rules, it would violate § 13902(a)(1).

If it were truly impossible for FMCSA to comply with both § 350 and § 13902(a)(1), then we would be presented with an irreconcilable conflict of laws. As the later enacted provision, § 350 would quite possibly win out. See *Posadas* v. *Na-*

*tional City Bank*, 296 U. S. 497, 503 (1936). But FMCSA can easily satisfy both mandates: It can issue the application and safety inspection rules required by § 350, and start processing applications by Mexican motor carriers and authorize those that satisfy § 13902(a)(1)'s conditions. Without a conflict, then, FMCSA must comply with all of its statutory mandates.

Respondents must rest, then, on a particularly unyielding variation of "but for" causation, where an agency's action is considered a cause of an environmental effect even when the agency has no authority to prevent the effect. However, a "but for" causal relationship is insufficient to make an agency responsible for a particular effect under NEPA and the relevant regulations. As this Court held in *Metropolitan Edison Co.* v. *People Against Nuclear Energy*, 460 U. S. 766, 774 (1983), NEPA requires "a reasonably close causal relationship" between the environmental effect and the alleged cause. The Court analogized this requirement to the "familiar doctrine of proximate cause from tort law." *Ibid.* In particular, "courts must look to the underlying policies or legislative intent in order to draw a manageable line between those causal changes that may make an actor responsible for an effect and those that do not." *Id.*, at 774, n. 7. See also W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts 264, 274–275 (5th ed. 1984) (proximate cause analysis turns on policy considerations and considerations of the "legal responsibility" of actors).

Also, inherent in NEPA and its implementing regulations is a "'rule of reason,'" which ensures that agencies determine whether and to what extent to prepare an EIS based on the usefulness of any new potential information to the decisionmaking process. See *Marsh*, 490 U. S., at 373–374. Where the preparation of an EIS would serve "no purpose" in light of NEPA's regulatory scheme as a whole, no rule of reason worthy of that title would require an agency to prepare an EIS. See *Aberdeen & Rockfish R. Co.* v. *Students*

*Challenging Regulatory Agency Procedures (SCRAP)*, 422 U. S. 289, 325 (1975); see also 40 CFR §§ 1500.1(b)–(c) (2003).

In these circumstances, the underlying policies behind NEPA and Congress' intent, as informed by the "rule of reason," make clear that the causal connection between FMCSA's issuance of the proposed regulations and the entry of the Mexican trucks is insufficient to make FMCSA responsible under NEPA to consider the environmental effects of the entry. The NEPA EIS requirement serves two purposes. First, "[i]t ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Robertson*, 490 U. S., at 349. Second, it "guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Ibid.* Requiring FMCSA to consider the environmental effects of the entry of Mexican trucks would fulfill neither of these statutory purposes. Since FMCSA has no ability categorically to prevent the cross-border operations of Mexican motor carriers, the environmental impact of the cross-border operations would have no effect on FMCSA's decisionmaking—FMCSA simply lacks the power to act on whatever information might be contained in the EIS.

Similarly, the informational purpose is not served. The "informational role" of an EIS is to "giv[e] the public the assurance that the agency 'has indeed considered environmental concerns in its decisionmaking process,' *Baltimore Gas & Electric Co.* [v. *Natural Resources Defense Council, Inc.*, 462 U. S. 87, 97 (1983)], and, perhaps more significantly, provid[e] a springboard for public comment" in the agency decisionmaking process itself, *ibid.* The purpose here is to ensure that the "larger audience," *ibid.*, can provide input as necessary to the agency making the relevant decisions. See 40 CFR § 1500.1(c) (2003) ("NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster ex-

cellent action. The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment"); § 1502.1 ("The primary purpose of an environmental impact statement is to serve as an action-forcing device to insure that the policies and goals defined in the Act are infused into the ongoing programs and actions of the Federal Government"). But here, the "larger audience" can have no impact on FMCSA's decisionmaking, since, as just noted, FMCSA simply could not act on whatever input this "larger audience" could provide.[2]

It would not, therefore, satisfy NEPA's "rule of reason" to require an agency to prepare a full EIS due to the environmental impact of an action it could not refuse to perform. Put another way, the legally relevant cause of the entry of the Mexican trucks is *not* FMCSA's action, but instead the actions of the President in lifting the moratorium and those of Congress in granting the President this authority while simultaneously limiting FMCSA's discretion.

Consideration of the CEQ's "cumulative impact" regulation does not change this analysis. An agency is required to evaluate the "[c]umulative impact" of its action, which is defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." § 1508.7. The "cumulative impact" regulation required FMCSA to consider the "incremental impact" of the safety rules themselves, in the context of the President's lifting of the moratorium

---

[2] Respondents are left with arguing that an EIS would be useful for informational purposes entirely outside FMCSA's decisionmaking process. See Brief for Respondents 42. But such an argument overlooks NEPA's core focus on improving agency decisionmaking. See 40 CFR §§ 1500.1, 1500.2, 1502.1 (2003).

and other relevant circumstances. But this is exactly what FMCSA did in its EA. FMCSA appropriately and reasonably examined the incremental impact of its safety rules assuming the President's modification of the moratorium (and, hence, assuming the increase in cross-border operations of Mexican motor carriers). The "cumulative impact" regulation does not require FMCSA to treat the lifting of the moratorium itself, or consequences from the lifting of the moratorium, as an effect of its promulgation of its Application and Safety Monitoring Rules.[3]

## C

We hold that where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant "cause" of the effect. Hence, under NEPA and the implementing CEQ regulations, the agency need not consider these effects in its EA when determining whether its action is a "major Federal action." Because the President, not FMCSA, could authorize (or not authorize) cross-border operations from Mexican motor carriers, and because FMCSA has no discretion to prevent the entry of Mexican trucks, its EA did not need to consider the environmental effects arising from the entry.[4]

---

[3] The Court of Appeals and respondents contend that the EA contained numerous other errors, but their contentions are premised on the conclusion that FMCSA was required to take into account the increased cross-border operations of Mexican motor carriers.

[4] Respondents argue that Congress ratified the Court of Appeals' decision when it, after the lower court's opinion, reenacted § 350 in two appropriations bills. The doctrine of ratification states that "Congress is presumed to be aware of [a] . . . judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons,* 434 U. S. 575, 580 (1978). But this case involves the interpretation of NEPA and the CAA, not § 350. Indeed, the precise requirements of § 350 were not below, and are not here, in dispute. Hence, congressional reenactment of § 350 tells us nothing about Congress' view

## III

Under the CAA, a federal "department, agency, or instrumentality" may not, generally, "engage in, support in any way or provide financial assistance for, license or permit, or approve, any activity" that violates an applicable state air-quality implementation plan. 42 U. S. C. § 7506(c)(1); 40 CFR § 93.150(a) (2003). Federal agencies must, in many circumstances, undertake a conformity determination with respect to a proposed action, to ensure that the action is consistent with § 7506(c)(1). See 40 CFR §§ 93.150(b), 93.153(a)–(b). However, an agency is exempt from the general conformity determination under the CAA if its action would not cause new emissions to exceed certain threshold emission rates set forth in § 93.153(b). FMCSA determined that its proposed regulations would not cause emissions to exceed the relevant threshold amounts and therefore concluded that the issuance of its regulations would comply with the CAA. App. to Pet. for Cert. 65a–66a, 155a. Critical to its calculations was its consideration of only those emissions that would occur from the increased roadside inspections of Mexican trucks; like its NEPA analysis, FMCSA's CAA analysis did not consider any emissions attributable to the increased presence of Mexican trucks within the United States.

The EPA's rules provide that "a conformity determination is required for each pollutant where the total of direct and indirect emissions in a nonattainment or maintenance area caused by a Federal action would equal or exceed" the threshold levels established by the EPA. 40 CFR § 93.153(b) (2003). "Direct emissions" are defined as those covered emissions "that are caused or initiated by the Federal action and occur at the same time and place as the

---

as to the requirements of NEPA and the CAA, and so, on the legal issues involved in this case, Congress has been entirely silent.

772

action." § 93.152. The term "[i]ndirect emissions" means covered emissions that

> "(1) Are caused by the Federal action, but may occur later in time and/or may be further removed in distance from the action itself but are still reasonably foreseeable; and
>
> "(2) The Federal agency can practicably control and will maintain control over due to a continuing program responsibility of the Federal agency." *Ibid.*

Unlike the regulations implementing NEPA, the EPA's CAA regulations have defined the term "[c]aused by." *Ibid.* In particular, emissions are "[c]aused by" a federal action if the "emissions . . . would not . . . occur in the absence of the Federal action." *Ibid.* Thus, the EPA has made clear that for purposes of evaluating causation in the conformity review process, some sort of "but for" causation is sufficient.

Although arguably FMCSA's proposed regulations would be "but for" causes of the entry of Mexican trucks into the United States, the emissions from these trucks are neither "direct" nor "indirect" emissions. First, the emissions from the Mexican trucks are not "direct" because they will not occur at the same time or at the same place as the promulgation of the regulations.

Second, FMCSA cannot practicably control, nor will it maintain control, over these emissions. As discussed above, FMCSA does not have the ability to countermand the President's decision to lift the moratorium, nor could it act categorically to prevent Mexican carriers from being registered or Mexican trucks from entering the United States. Once the regulations are promulgated, FMCSA would have no ability to regulate any aspect of vehicle exhaust from these Mexican trucks. FMCSA could not refuse to register Mexican motor carriers simply on the ground that their trucks would pollute excessively. FMCSA cannot determine

whether registered carriers actually will bring trucks into the United States, cannot control the routes the carriers take, and cannot determine what the trucks will emit. Any reduction in emissions that would occur at the hands of FMCSA would be mere happenstance. It cannot be said that FMCSA "practicably control[s]" or "will maintain control" over the vehicle emissions from the Mexican trucks, and it follows that the emissions from the Mexican trucks are not "indirect emissions." *Ibid.;* see also Determining Conformity of General Federal Actions to State or Federal Implementation Plans, 58 Fed. Reg. 63214, 63221 (1993) ("The EPA does not believe that Congress intended to extend the prohibitions and responsibilities to cases where, although licensing or approving action is a required initial step for a subsequent activity that causes emissions, the agency has no control over that subsequent activity").

The emissions from the Mexican trucks are neither "direct" nor "indirect" emissions caused by the issuance of FMCSA's proposed regulations. Thus, FMCSA did not violate the CAA or the applicable regulations by failing to consider them when it evaluated whether it needed to perform a full "conformity determination."

## IV

FMCSA did not violate NEPA or the relevant CEQ regulations when it did not consider the environmental effect of the increase in cross-border operations of Mexican motor carriers in its EA. Nor did FMCSA act improperly by not performing, pursuant to the CAA and relevant regulations, a full conformity review analysis for its proposed regulations. We therefore reject respondents' challenge to the procedures used in promulgating these regulations. Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*