KOZINSKI, Circuit Judge,
with whom Judges O’SCANNLAIN, KLEINFELD, TALLMAN, CALLAHAN and BEA join, dissenting from denial of rehearing en banc:
Less than two years ago, the Supreme Court unanimously reversed our interpretation of the National Environmental Policy Act (NEPA). See Dep’t of Transp. v. Pub. Citizen, 541 U.S. 752, 124 S.Ct. 2204, 159 L.Ed.2d 60 (2004). Tone-deaf to the Supreme Court’s message, the panel majority in this case interprets the Endangered Species Act (ESA) in precisely the same incorrect way we interpreted NEPA, dramatically expanding agencies’ obligations under the law. Along the way, the majority tramples all over the Fish and Wildlife Service’s (FWS) reasonable interpretation of the ESA, deliberately creates a square inter-circuit conflict with the Fifth and D.C. Circuits, and ignores at least six prior opinions of our own court. Finally, the decision is one of considerable importance to the federal government and the states of our circuit. This is precisely the kind of case we should take en banc to set our own house in order.
Background
The Clean Water Act (CWA) instructs that the Environmental Protection Agency (EPA) “shall” transfer pollution permitting authority to a state if the state’s proposal meets nine criteria. See 33 U.S.C. § 1342(b). None of the criteria involves consideration of endangered species. Arizona applied to take over the CWA permitting process within its borders — the forty-fifth state to do so. There is no dispute that its proposal met all nine criteria listed in the CWA.
The EPA regional office in San Francisco, however, was worried that the transfer might affect endangered species. See 16 U.S.C. § 1536(a)(2) (section 7(a)(2) of the ESA) (requiring federal agencies to “insure” that their actions do not jeopardize endangered species). It thus initiated consultation with FWS pursuant to ESA section 7. The regional office also stated publicly that section 7 required EPA to take endangered species into account when making a transfer decision. FWS’s local office in Arizona similarly expressed concerns about the transfer.
Next, the matter was “elevated,” meaning the national offices of EPA and FWS took over. After national-level discussions, FWS reversed course, recommending immediate approval of the transfer. *396 That agency issued a Biological Opinion (BiOp) concluding that any impact of the transfer on endangered species would be the unavoidable result of (1) Congress’s decision to make ESA section 7 inapplicable to the states, and (2) Congress’s decision to require transferring the permitting process to the states, provided the nine criteria were met (none of which included consideration of endangered species). Thus, under FWS’s interpretation, the ESA was inapplicable: EPA’s decision to grant the transfer could not “cause” any impact on endangered species because the decision was non-discretionary. Two days after receiving FWS’s recommendation, EPA approved the transfer.
Discussion
In striking down EPA’s transfer approval, the majority makes five fundamental blunders: First, it mistakes EPA’s internal deliberations for analytical inconsistency. Second, the majority fails to give appropriate deference to FWS’s interpretation of the ESA. Third, the majority treats the ESA as superior to all other laws, thereby nullifying a crucial ESA regulation and forcing agencies to violate their governing statutes. Fourth, the majority contradicts the Supreme Court’s recent pronouncement in Public Citizen. Finally, the majority dismisses the reasoned opinions of two other circuits, creating a square conflict.
1. The majority first finds that EPA’s decisionmaking process was internally inconsistent. See Defenders of Wildlife v. EPA, 420 F.3d 946, 959-62 (9th Cir.2006). On the one hand, EPA stated several times that the ESA required it to consider endangered species before approving the transfer. On the other hand, the agency concluded it had no discretion under the CWA to take endangered species into account when making the transfer decision. Thus, the majority finds, EPA’s decision “cannot stand.” Id. at 962.
The majority makes a big fuss over the supposed internal inconsistency in EPA’s reasoning, but the so-called problem is of the panel’s own making. The only “inconsistency” is between the San Francisco regional office’s interpretation of the ESA and the interpretation by EPA headquarters in Washington, D.C. In other words, EPA changed its mind upon further reflection at a higher level. The agency’s position is that adopted by EPA at the national level; the position taken by the agency’s regional office was simply overruled by the national office in Washington. There is no inconsistency in the agency’s final action, which is the only one we are entitled to review. See 5 U.S.C. § 704.
The majority also points out that EPA’s final action in this case was inconsistent with the actions it has taken when other states have applied for a transfer. See Defenders of Wildlife, 420 F.3d at 952 n.3 (noting that all of EPA’s transfer decisions since 1993 — six besides Arizona — have taken endangered species into account, whereas none before 1993 did). But there is no indication that EPA’s deliberations in the other cases were ever elevated to the national level. As far as we know, this is the only case in which EPA’s Washington, D.C. office has opined on the applicability of the ESA to the transfer of the CWA permitting process. Moreover, an agency is not locked into a particular position forever; it is entitled to change its view over time. See Mesa Verde Constr. Co. v. N. Cal. Dist. Council of Laborers, 861 F.2d 1124, 1130 (9th Cir.1988) (en banc). EPA’s actions in other cases are irrelevant to whether its analysis was internally inconsistent in this one.
In any event, the majority’s finding of an inconsistency in EPA’s analysis, if correct, should have been the end of the case; *397 the majority should have remanded to EPA for further clarification, as the agency asked the panel to do. See Defenders of Wildlife, 420 F.3d at 969 n.19. Even the majority itself says it “must remand” to EPA for clarification. See id. at 962. Instead, it embarks on a 17-page boondoggle, conducting the very analysis that EPA should have had an opportunity to conduct for itself. See Gonzales v. Thomas, — U.S. -, -, 126 S.Ct. 1613, 1614, 164 L.Ed.2d 358 (2006) (“The Ninth Circuit’s failure to remand is legally erroneous, and that error is ‘obvious in light of Ventura,’ itself a summary reversal.”).
2. In faulting EPA for its alleged internal inconsistencies, the majority misconstrues the way the ESA was meant to operate. Under the ESA, a federal agency must consider whether its action “may affect” endangered species. 50 C.F.R. § 402.14(a). If the agency thinks endangered species might be affected, it must ask FWS whether its supposition is correct — whether its action would, in fact, affect endangered species — and, if so, what the impact on endangered species will be. See id.; id. §§ 402.14(e), (h). Then, FWS must respond by issuing a BiOp that the agency must take into account before making its decision. See id. §§ 402.14(e), 402.15(a).
In this case, EPA was initially concerned that its approval of Arizona’s transfer application might affect endangered species. EPA does not administer the ESA, so it doesn’t have the expertise to know for sure. See Am. Forest & Paper Ass’n v. EPA, 137 F.3d 291, 297 (5th Cir.1998). In order to find out whether its transfer approval would, in fact, affect endangered species, EPA did exactly what it was supposed to do: It asked FWS, the agency that is charged with administering the ESA. See United States v. McKittrick, 142 F.3d 1170, 1174 (9th Cir.1998). And FWS did exactly what it was supposed to do: It responded with a BiOp informing EPA that its approval would not, in fact, affect endangered species. See p. 396 supra. With this advice from the congres-sionally designated experts in hand, EPA decided that its initial concerns were unfounded and that it could go forward with the transfer approval.
The majority finds this perfectly logical sequence of events to be “nonsensical” and impermissible. See Defenders of Wildlife, 420 F.3d at 961. According to the majority, once EPA expressed concern that its action might affect endangered species, it had already conclusively determined that its decision was governed by the ESA. See id. In other words, under the majority’s interpretation, once FWS is consulted for guidance, it is precluded from ever determining that the ESA is inapplicable.
With all due respect to my colleagues, it is their conclusion that is nonsensical, undermining the entire consultative process that the ESA establishes and striking down FWS’s perfectly reasonable interpretation of the ESA. The majority forgets that FWS is the agency charged with administering the ESA, and that its interpretation of the ESA is thus entitled to Chevron deference. See Babbitt v. Sweet Home Chapter of Communities for a Great Oregon, 515 U.S. 687, 703, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995) (citing Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). Here, FWS determined — after careful study at the local and national levels — that the ESA was inapplicable to EPA’s decision, and it issued a BiOp relaying its conclusion to the EPA. The majority cannot overturn FWS’s statutory interpretation simply because it disagrees with it.
3. Having decided to conduct — on its own — the very analysis that FWS already *398 conducted, the majority comes out the other way, getting it flatly wrong. The majority concludes that section 7 of the ESA required EPA to take endangered species into account when making the transfer decision, notwithstanding the plain contrary language of the CWA. It thus transformed the ESA into an overriding mandate that trumps an agency’s obligations under its own governing statute. See Defenders of Wildlife, 420 F.3d at 963-67.
Further, the majority handily disposes of a regulation issued by FWS that was supposed to limit ESA’s applicability to “actions in which there is discretionary Federal involvement or control.” 50 C.F.R. § 402.03 (emphasis added). Unable to reconcile this regulation with its newly expansive interpretation of the ESA’s mandate, the majority simply finds that the word “discretionary” in the regulation is meaningless; the regulation, announces the majority, is “coterminous” with the statute it interprets. See Defenders of Wildlife, 420 F.3d at 967-69. In other words, despite FWS’s regulation, the majority finds that the ESA applies to anything “authorized, funded, or carried out” by a federal agency, 16 U.S.C. § 1536(a)(2), whether discretionary or not. Again, the majority fails to give FWS the deference it is due.[1]
In his dissent, Judge Thompson succinctly identifies the serious flaws in the majority’s analysis. He points out that EPA had no authority under the CWA to consider endangered species when making the transfer decision. And he explains that the majority’s interpretation of the scope of ESA’s applicability contradicts our precedents: “[W]e have consistently recognized that an agency may have deci-sionmaking authority and yet not be empowered ... to act to protect endangered species.” Defenders of Wildlife, 420 F.3d at 979-80 (Thompson, J., dissenting) (citing six Ninth Circuit precedents that contradict the majority’s holding). Once the nine criteria were met, the dissent concludes, the CWA mandated the transfer; nothing in ESA section 7 allows — let alone requires — the EPA to ignore the clear language of the CWA. See id. at 980-81.[2]
4. The majority’s superfluous holding — that ESA forces an agency to consider the impact of its decisions on endangered species, even when the agency’s governing statute precludes it from doing so — also flies in the face of Public Citizen, where the Supreme Court unanimously reversed our interpretation of NEPA. See 541 U.S. at 770, 773, 124 S.Ct. 2204.
The issue in Public Citizen was whether NEPA “require[s] the Federal Motor Carrier Safety Administration (FMCSA) to evaluate the environmental effects of cross-border operations of Mexican-domiciled motor carriers” before deciding whether to grant registration to Mexican trucks. Id. at 756, 124 S.Ct. 2204. *399 NEPA’s language, regarding when and how an agency must take into account the impact of its actions on the environment, is similar to ESA’s language regarding endangered species. Compare 42 U.S.C. § 4332(2)(C) and 40 C.F.R. § 1508.18, with 16 U.S.C. § 1536(a)(2) and 50 C.F.R. § 402.03. And the FMCSA’s governing statute, like the CWA, instructs that the agency “shall” grant registration to any carrier meeting certain criteria, none of which involves environmental concerns. See 49 U.S.C. § 13902(a)(1).
In upholding the agency’s decision to grant registration without taking into account the environmental impact of Mexican trucks, the Supreme Court stressed that “FMCSA has only limited discretion regarding motor vehicle carrier registration: It must grant registration to all domestic or foreign motor carriers that are willing and able to comply with the applicable ... requirements. FMCSA has no statutory authority to impose or enforce emissions controls or to establish environmental requirements unrelated to motor carrier safety.” Id. at 758-59, 124 S.Ct. 2204 (internal quotation marks and citation omitted). The Supreme Court concluded that “where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant ‘cause’ of the effect.[3] Hence, under NEPA ... the agency need not consider these effects .... [BJecause FMCSA has no discretion to prevent the entry of Mexican trucks, [it] did not need to consider the environmental effects arising from the entry.” Public Citizen, 541 U.S. at 770, 124 S.Ct. 2204.
The Supreme Court’s holding in Public Citizen applies equally to this case: Because EPA had no discretion under the CWA to prevent the transfer of permitting authority to Arizona, it did not need to consider the transfer’s effects on endangered species. The majority’s contrary conclusion cannot be reconciled with the Supreme Court’s unanimous decision.[4]
*400 5. Finally, the majority opinion squarely, and admittedly, conflicts with the Fifth and D.C. Circuits. See Defenders of Wildlife, 420 F.3d at 970. In American Forest & Paper Ass’n v. EPA, the Fifth Circuit considered precisely the same question at issue in this case: whether the ESA imposes its own criteria on EPA’s decision to transfer CWA permitting authority to a state — in that case, Louisiana' — or whether the nine factors enumerated in the CWA are, as the plain text of the statute requires, an exhaustive list that precludes consideration of endangered species. See 137 F.3d 291, 297-99 (5th Cir.1998).
In American Forest, unlike in this case, the EPA wanted to condition the transfer of the permitting process on protection of endangered species. But the Fifth Circuit determined — in direct contradiction to the majority here — that “[t]he [CWA’s] plain language directs EPA to approve proposed state programs that meet the enumerated criteria; particularly in light of the command ‘shall approve,’ [the CWA] cannot be construed to allow EPA to expand the list of permitting requirements” to include consideration of endangered species. Id. at 298. Further, when EPA argued that the ESA compelled it to consider endangered species, the Fifth Circuit interpreted section 7(a)(2) of the ESA to mean exactly the opposite of the majority’s holding:
[I]f EPA lacks the power to add additional criteria to CWA § 402(b), nothing in the ESA grants the agency the authority to do so. Section 7 of the ESA ... confers no substantive powers.
... [T]he ESA serves not as a font of new authority, but as something far more modest: a directive to agencies to channel them existing authority in a particular direction. The upshot is that EPA cannot invoke the ESA as a means of creating and imposing requirements that are not authorized by the CWA
Id. at 298-99 (second emphasis added) (footnote omitted). In recognition of the circuit split it is creating, the majority dismisses the Fifth Circuit’s reasoning out of hand, calling it a “fundamental misconception” and “simply incorrect.” Defenders of Wildlife, 420 F.3d at 971.
The D.C. Circuit has also considered the ESA’s power to override the mandate of an agency’s governing statute. See Platte River Whooping Crane Critical Habitat Maint. Trust v. FERC, 962 F.2d 27, 32-33 (D.C.Cir.1992). Under the Federal Power Act, the Federal Energy Regulatory Commission (FERC) was precluded from amending the annual licenses it gave to a hydroelectric plant, and thus could not insert wildlife protective conditions into the license upon renewal. See id. at 32. Petitioners alleged, however, that notwithstanding the Federal Power Act, section 7 *401 of the ESA required FERC to impose such conditions on the licensee. See id. at 33. The D.C. Circuit disagreed:
The Trust reads section 7 essentially to oblige the Commission to do “whatever it takes” to protect the threatened and endangered species that inhabit the Platte River basin; any limitations on FERC’s authority contained in the [Federal Power Act] are implicitly superseded by this general command.... We think the Trust’s interpretation of the ESA is farfetched. As the Commission explained, the statute directs agencies to “utilize their authorities” to carry out the ESA’s objectives; it does not expand the powers conferred on an agency by its enabling act.
Id. at 34. Like the Fifth Circuit, the D.C. Circuit’s interpretation of the ESA directly contradicts the majority’s holding in this case. But again, the majority dismisses its sister circuit’s reasoning as “cursory” and unpersuasive. Defenders of Wildlife, 420 F.3d at 971.[5]
The majority’s opinion has far-reaching effects on the scope of the Endangered Species Act. Its holding — that the ESA imposes an affirmative duty on a federal agency to protect endangered species, even in the face of a governing statute that explicitly precludes the agency from doing so — contradicts FWS’s statutory interpretation, ignores the very recent instructions of the Supreme Court, and creates a conflict with two other circuits. And for what? All EPA asks for is to have an opportunity to clarify its position on the issue, and explain why its decision to transfer permitting authority to Arizona made sense. Even more recent Supreme Court instructions emphatically command us to do just that. See Thomas, 126 S.Ct. at 1614-15. The majority’s stubborn refusal to give the agency that opportunity before vacating its transfer decision has put us in a highly precarious position vis-a-vis the executive branch, the states, the other circuits and the Supreme Court. We should have taken the case en banc and fixed the problems ourselves.

. The majority points out that “ § 402.03 is a regulation, not a statute,” Defenders of Wildlife, 420 F.3d at 969 n.19, as if that somehow robs its interpretation of deference. But FWS issued the regulation in question. See id. at 951 n.l. Its interpretation of the regulation is therefore also entitled to "substantial deference.” Martin v. Occupational Safety & Health Review Comm’n, 499 U.S. 144, 150, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991) (internal quotation marks omitted).

. We cannot presume that Congress repealed the CWA’s categorical mandate sub silentio, simply by passing the ESA. See n.4 infra. But even if we were inclined to believe, as the panel majority does, that the CWA and ESA need to be reconciled, FWS's regulation is a perfectly plausible way to do so: By limiting the ESA's applicability to "discretionary” agency actions, 50 C.F.R. § 402.03, the regulation avoids the supposed conflict the majority has created between the ESA and governing statutes — like the CWA — that mandate agency action.

. The majority quotes this sentence verbatim from Public Citizen. Defenders of Wildlife, 420 F.3d at 963. But, instead of recognizing that this language controls the case, the majority uses it as a springboard to launch into its unnecessary analysis.

. Judge Berzon's concurrence dismisses Public Citizen as "entirely uninformative,” concurrence at 406, by labeling NEPA as a "strictly procedural statute” and the ESA as a "partially substantive statute,” id. What Judge Berzon must be arguing is that the ESA effected a sub silentio repeal of EPA's categorical obligation under the CWA, so that the statutory "shall” was foreshortened to "may.” There is absolutely no indication that Congress meant to do any such thing and we should long hesitate before concluding that it did this unknowingly. See Watt v. Alaska, 451 U.S. 259, 267, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981) (noting the maxim of statutory interpretation that "repeals by implication are not favored,” and stating that "[t]he intention of the legislature to repeal must be clear and manifest” (internal quotation marks omitted)); id. at 280, 101 S.Ct. 1673 (Stewart, J., dissenting) ("The maxim that 'repeals by implication are disfavored' has force when the argument is made that a general statute ... eviscerates an earlier and more specific enactment of limited coverage but without an indication of congressional intent to do so.”); see also Ex parte Yerger, 8 Wall. 85, 105, 19 L.Ed. 332 (1869) ("Repeals by implication are not favored. They are seldom admitted except on the ground of repugnancy; and never, we think, when the former act can stand together with the new act.”).
If the ESA were as powerful as the majority contends, it would modify not only EPA's obligation under the CWA, but every categorical mandate applicable to every federal agency. We should be particularly chary of holding that the ESA made such sweeping changes when the agency charged with implementing the statute has adopted a regulation allowing the ESA to coexist peacefully with all categorical mandates. See 50 C.F.R. § 402.03; n.2 supra. There is no justification for nullifying countless congressional di *400 rectives by casting aside the agency's authoritative interpretation of the ESA, formally adopted pursuant to notice and comment procedures.
Unless one buys into the dubious proposition that Congress somehow repealed the term "shall” in 33 U.S.C. § 1342(b), this case is a carbon copy of Public Citizen. "Shall” means shall here as it did there; thus EPA has no discretion to deny the transfer once the nine statutory criteria are satisfied. See Kleinfeld dissent at 401-02. Just as in Public Citizen, the agency’s action — granting the transfer — is not a legally relevant "cause” of any impact on endangered species because the agency had no discretion in the matter once the statutory criteria were met. See 541 U.S. at 769, 124 S.Ct. 2204.
When we are confronted with a question of statutory interpretation, we must take into account the Supreme Court’s previous interpretation of highly similar words in an analogous situation, even if the two cases are not "identical.” Concurrence at 404. It is no doubt symptomatic of my "myopic” view of the world, id. at 406, but I believe we should treat Supreme Court pronouncements as binding, not as mere hazards to navigation.

. The majority concedes the conflict with the Fifth and D.C. Circuits but claims it is merely taking sides in a preexisting conflict, because the First and Eighth Circuits have issued opinions agreeing with its position. See id. at 970-71 (citing Conservation Law Found. v. Andrus, 623 F.2d 712 (1st Cir.1979), and Defenders of Wildlife v. EPA, 882 F.2d 1294 (8th Cir.1989)). The First and Eighth Circuit cases, however, do not support the majority's position. Both cases addressed situations where the governing statute and the ESA were complementary, not where the governing statute precluded consideration of endangered species as the CWA does. See Andrus, 623 F.2d at 715 ("[Tjhe assumption that the ESA and OCSLA are mutually exclusive ... is incorrect — the standards of these two acts are complementary, and the ESA will continue to apply of its own force ....”); Defenders of Wildlife, 882 F.2d at 1299 ("FIFRA does not exempt the EPA from complying with ESA requirements when the EPA registers pesticides.”). Neither circuit held, as the majority in this case does, that the ESA trumps the governing statute, or that the ESA applies when the governing statute precludes agency discretion regarding endangered species. The inter-circuit conflict is entirely of the panel's own making.