NOT FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

MAY 04 2015

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, <br><br> Plaintiff - Appellant, <br><br> v. <br><br> JAMES KENNA, in his official capacity as Arizona State Director of BLM and BUREAU OF LAND MANAGEMENT, <br><br> Defendants - Appellees. | No. 12-15110 <br><br> D.C. No. 2:10-cv-01096-SMM <br><br> MEMORANDUM[*] |

Appeal from the United States District Court
for the District of Arizona
Stephen M. McNamee, Senior District Judge, Presiding

Argued and Submitted February 11, 2014
San Francisco California

Before: THOMAS, Chief Judge, REINHARDT, Circuit Judge, and SESSIONS, District Judge.[**]

Western Watersheds Project appeals the district court's grant of summary

judgment in favor of the Bureau of Land Management ("BLM") on its claims

---

[*] This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36-3.

[**] The Honorable William K. Sessions III, District Judge for the U.S. District Court for the District of Vermont, sitting by designation.

under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, et seq. We review de novo the district court's grant of summary judgment, *Citizens for Better Forestry v. U.S. Dep't of Agriculture*, 341 F.3d 961, 969 (9th Cir. 2003), and we affirm. Because the parties are familiar with the history of this case, we need not recount it here.

I

Western Watersheds Project challenges the adequacy of the BLM's Resource Management Plan ("RMP") prepared by the BLM pursuant to the Federal Land Policy and Management Act of 1976, 43 U.S.C. § 1701 et seq., and an Environmental Impact Statement ("EIS") prepared for five allotments within the 1.3 million acres of land administered by the BLM's Yuma Field office in Southwestern Arizona and Southeastern California (the "planning area"). The RMP for the planning area qualified as a "major Federal action significantly affecting the quality of the human environment." *See* 42 U.S.C. § 4332(2)(c); 43 C.F.R. § 1601.0-6. Thus, NEPA required that an EIS be prepared. 42 U.S.C. § 4332(2)(C).

The purpose of an EIS is dual: "First, '[i]t ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts.' Second, it 'guarantees

2

that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.'" *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768 (2004) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989)).

Courts review the BLM's compliance with NEPA under § 706 of the Administrative Procedure Act, *Ctr. for Biological Diversity v. U.S. Dept. of Interior*, 623 F.3d 633, 641 (9th Cir. 2010), which allows a court to set aside the agency's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706 (2)(A).  In assessing whether an agency took a sufficiently "hard look" in an EIS, courts apply a "rule of reason" test to "determine whether the EIS contains a reasonably thorough discussion of the significant aspects of probable environmental consequences." *Hells Canyon Alliance v. U.S. Forest Serv.*, 227 F.3d 1170, 1177 (9th Cir. 2000) (internal quotation marks omitted).  This standard is "essentially the same" as the abuse of discretion standard. *Id.* at 1177 n.8 (citing *March v. Or. Natural Res. Council*, 490 U.S. 360, 377 n.23 (1989)).

II

The district court did not err in concluding that the BLM took the necessary "hard look" at the impacts of continuing grazing on five allotments within the planning area, including sufficient analysis to the impacts of livestock grazing, and the cumulative impacts of past grazing.

The RMP is prepared at a programmatic level. "An EIS for a programmatic plan . . . must provide 'sufficient detail to foster informed decision-making,' but 'site-specific impacts need not be fully evaluated until a critical decision has been made to act on site development.'" *Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 800 (9th Cir. 2003) (quoting *N. Alaska Envtl. Ctr. v. Lujan*, 961 F.2d 886, 890–91 (9th Cir. 1992)). At this stage, the BLM "develops alternative management scenarios responsive to public concerns, analyzes the costs, benefits and consequences of each alternative . . . and adopts an amendable . . . plan to guide management of multiple use resources." *Id.*

Unlike renewal of a grazing permit on a specific allotment, the RMP involved balancing a number of competing land use priorities across a vast landscape to craft a plan that would guide management of multiple use resources, potentially for many years to come. The five alternatives considered by the BLM during the planning process each reflected a different balancing of those priorities,

4

as reflected not only in their different allowances for grazing but also in such areas as recreation (motorized and non-motorized), mineral and energy development, and cultural resources. The RMP reflected the BLM's awareness of the impacts of historic and future grazing on wildlife, soil, and vegetation. Ultimately, though, the BLM chose an alternative that allowed for grazing to be available on a significant portion of the planning area.

The record supports the district court's conclusion that the BLM appropriately relied on agency expertise in a variety of areas, and that the EIS incorporated a sufficient amount of data to justify the "hard look" requirement.

III

The district court also properly concluded that the BLM considered a reasonable range of alternatives in the EIS. The level of detail required in an EIS is also directly tied to the scope of its parameters and purpose. *See Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1072 (9th Cir. 2002) ("[T]he scope of [an agency's] analysis in [an] EIS must be appropriate to the action in question.") BLM regulations define the scope of an EIS as "the range of actions, alternatives, and impacts to be considered" in the EIS. 40 C.F.R. § 1508.25. "Agencies should be given 'considerable discretion' in defining the scope of an EIS." *Nw. Res. Info.*

*Ctr., Inc. v. Nat'l Marine Fisheries Serv.*, 56 F.3d 1060, 1067 (9th Cir. 1995) (quoting *Thomas v. Peterson*, 753 F.2d 754, 757 (9th Cir. 1985)).

Western Watersheds argues that the BLM should have considered a reduction in grazing or reclassification of the five contested allotments in addition to the other alternatives presented in the proposed RMP. However, in creating the RMP for the planning area, the BLM limited its consideration to two categories of land use planning decisions: Desired Future Conditions and Management Actions. The former establishes goals and objectives, while the latter "identif[ies] where land uses are allowed, restricted, or prohibited" in furtherance of those goals and objectives. Both are "broad-scale decisions which guide future land management actions and subsequent site-specific implementation decisions." The BLM chose not to determine levels of use at this planning stage. Deferring to that decision, the district court properly concluded that the BLM considered an adequate range of alternatives. *See W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1047 (9th Cir. 2013) ("We conclude that at the programmatic level of NEPA review, it was reasonable for BLM to decline to analyze in detail an alternative that would change grazing management levels throughout the entire [planning area].").

Finally, BLM's consideration of the no-grazing alternative was adequate. Grazing was just one of many use allowances contained in the RMP, and all five

alternatives (with their different approaches to grazing and other uses) were considered side by side in numerous comparative charts. And again, the RMP contemplated that site-specific consideration of individual grazing permits would take place at a later time.

**AFFIRMED.**