RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0105p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

LARRY KLEIN and SIERRA CLUB,

        *Plaintiffs-Appellants,*

v.

UNITED STATES DEPARTMENT OF ENERGY and FRONTIER RENEWABLE RESOURCES, LLC,

        *Defendants-Appellees.*

No. 13-1165

Appeal from the United States District Court
for the Western District of Michigan at Marquette.
No. 2:11-cv-00514—R. Allan Edgar, District Judge.

Argued: January 30, 2014

Decided and Filed: May 21, 2014

BEFORE: MERRITT, SUTTON and STRANCH, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Marianne G. Dugan, Eugene, Oregon, for Appellants. J. David Gunter II, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Federal Appellee. **ON BRIEF:** Marianne G. Dugan, Eugene, Oregon, for Appellants. J. David Gunter II, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Federal Appellee. Daniel P. Ettinger, Gaëtan Gerville-Réache, WARNER NORCROSS & JUDD LLP, Grand Rapids, Michigan for Appellee Frontier Renewable.

      SUTTON, J., delivered the opinion of the court, in which MERRITT and STRANCH, JJ., concurred. STRANCH, J. (pp. 13–16), delivered a separate concurrence.

———————————

**OPINION**

———————————

SUTTON, Circuit Judge.   In connection with an alternative energy program created by Congress, Frontier Renewable Resources sought funding from the United States Department of Energy to build a plant in the Upper Peninsula of Michigan that would convert lumber into ethanol.   The federal program subsidizes renewable energy projects as part of an effort to lessen the country's dependence on fossil fuels.   Larry Klein and the Sierra Club sued to stop the project, claiming that the Department of Energy failed to comply with the National Environmental Policy Act when it conducted an assessment of the project and found no significant environmental impact.   The district court rejected the claims because the plaintiffs lack standing to bring them and because the Department of Energy at any rate permissibly found no significant impact from the proposed plant.   We reverse in part and affirm in part.

I.

The Energy Policy Act of 2005 directs the Department of Energy to fund alternative energy projects—"biorefinery demonstration projects" in the words of the statute.   42 U.S.C. § 16232(d).   The idea was to encourage the Department to work with industry to develop ways to convert trees, crops and agricultural waste into energy—to create "technologies capable of making fuels from lignocellulosic feedstocks" in the words of the statute.   *Id.* § 16232(c).

Frontier Renewable Resources applied for a grant to help it construct a proposed plant in Michigan's Upper Peninsula (Kinross Charter Township) that would convert lumber into ethanol.   The Frontier plant will use 770 tons of wood chips per day to produce 20 million gallons of ethanol per year.   The plant's design would allow a future expansion, one that could double the ethanol produced.

As required by the National Environmental Policy Act, the Department studied the potential environmental impact of the proposed plant before awarding the grant.   It first prepared a draft environmental assessment.   It then sought comments and questions about the draft.   After receiving this input, it issued a final environmental assessment in July 2011 that proposed some

changes to the Frontier plant's operations, including the use of a biomass boiler instead of natural gas boilers to generate power to run the plant. Because the environmental assessment showed relatively few environmental impacts from the Frontier plant, the Department issued a finding of "no significant impact" and granted Frontier's funding application. AR at 1957–62, 1970–72. The Department pledged roughly $100 million toward the construction of the plant, about 34% of its total cost.

Larry Klein and the Sierra Club sued the Department and Frontier to halt the project, alleging that the Department did not comply with the National Environmental Policy Act in making the grant. After the parties filed cross-motions for summary judgment, the district court ruled for the Department and Frontier on two grounds: The plaintiffs lacked standing to bring the claims, and the claims failed on the merits anyway.

II.

Before bringing a case in federal court, a plaintiff must establish standing to do so. The requirements of standing are: (1) "an injury in fact"; (2) "a causal connection" between the alleged injury and the defendants' conduct—that "the injury . . . [is] fairly traceable to the challenged action . . . and not the result of the independent action of some third party not before the court"; and (3) redressability—that the injury will "likely . . . be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks and alterations omitted).

In debating whether standing exists in this case, the parties share considerable common ground. They agree that Klein established an injury in fact. They agree that Klein's injury spares Sierra Club the work of establishing an injury of its own. *See Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 584 F.3d 253, 261 (6th Cir. 2009) (en banc). And they agree that, when it comes to procedural-rights cases like this one, the causation and redressability requirements are relaxed. *See Lujan*, 504 U.S. at 572 n.7 ("The person who has been accorded a procedural right to protect his concrete interest can assert that right without meeting all the normal standards for redressability and immediacy."); *Massachusetts v. EPA*, 549 U.S. 497, 517–18 (2007) ("When a litigant is vested with a procedural right, that litigant has standing if there is

some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant.").

In applying the three requirements of standing, the district court found that the plaintiffs could not establish causation and redressability, issues that it determined—based on its theory of redressability—"boil down to whether the Project could go forward without the DOE's funding." R.68 at 15. It decided that the record showed the plant would go forward with or without funding and held that the plaintiffs therefore lacked standing. The parties disagree over the district court's theory of redressability and its factual determination.

What principally divides the parties on the question of fact undergirding the district court's application of its understanding of redressability is whether the district court correctly determined that the record shows that Frontier will build the plant no matter what—even if it loses a third of its funding. In our view, the plaintiffs have the better of the argument. The factual record on this score is spare. What we have is a statement, a fact and an inference. The statement appears in the Department's final environmental assessment. It says without explanation or elaboration that "this project could proceed if [the Department] decided not to provide financial assistance." AR at 1342. The fact appears in the project's funding documents, which show that the Department's funding amounts to 34% of the cost of the plant. The inference is that, even though the project "could" proceed without federal funding, the withdrawal of a 34% subsidy would end the project. That indeed is the inference the Department drew, noting that it "has assumed . . . that the project would not proceed without its assistance." AR at 1342.

At the summary judgment stage, the plaintiffs get the benefit of any reasonable inferences that the facts permit. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). One can reasonably infer that this project would not proceed if more than a third of its funding disappeared, especially since that funding takes the form of a grant rather than a loan. Having pointed to a "specific fact[]" that supports their claim that Frontier will *not* build the plant if the Department pulls its purse string closed, the plaintiffs did all that is needed to avoid summary judgment under the district court's standard. *Lujan*, 504 U.S. at 561 (internal quotation marks and citations omitted).

Before turning to the merits, two final points deserve mention. First, because it will resolve this appeal, we have addressed only the factual conclusion that underlies the Government's premise (shared by the district court) that whether or not Frontier would build the plant without federal funding resolves the redressability question. We need not, and thus do not, determine whether that view of redressability is correct.

Second, Klein and the Sierra Club blame the Administrative Procedure Act for the spare record on standing. In one sense, they have a point. The Act governs challenges to agency actions. And it requires courts to "review the whole record" compiled by the agency when evaluating the lawfulness of an agency decision, 5 U.S.C. § 706(2), meaning review of the agency's decision turns on the record before the agency at the time of its decision, not on later evidence developed outside the administrative record, s*ee Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419–20 (1971). Yet these truths do not prevent a district court from ascertaining whether Article III standing exists in the case or from developing a record to determine whether standing exists. The Administrative Procedure Act does not suspend the Federal Rules of Civil Procedure. *Cf. Lujan*, 504 U.S. at 561 (referring to the normal "stages of the litigation" governed by the civil rules).

III.

As for the merits, the agency's environmental assessment adequately supported its finding that funding the plant would not have a significant impact on the environment.

The National Environmental Policy Act requires federal agencies to study the environmental impacts of "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). Regulations set forth a process for complying with the Act. An agency first prepares a report known as an "environmental assessment" in consultation with federal, state, and local agencies, the public and other interested parties. 40 C.F.R. § 1501.4(b). Based on that assessment, the agency decides whether the environmental effects require further study. If not, the agency issues a "finding of no significant impact." *Id.* § 1501.4(e). If further study is required, the agency prepares an "environmental impact statement." *Id.* § 1501.4(c)–(d).

In carrying out the Act, the agency has considerable discretion. Courts review an agency's actions under the Act through the deferential lens of the "arbitrary" and "capricious"

standard.   5 U.S.C. § 706(2)(A).   Through "searching and careful" review, *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989), they ask whether the agency "adequately studied the issue and [took] a hard look at the environmental consequences of its decision," not whether the agency correctly assessed the proposal's environmental impacts.   *Save Our Cumberland Mountains v. Kempthorne*, 453 F.3d 334, 339 (6th Cir. 2006) (quotation omitted).

The Department's environmental assessment—over 400 pages in length—meets this deferential standard.   The assessment explained that the Department's funding of the plant will carry out the requirements of the Energy Policy Act, which aim to reduce dependence on fossil fuels by commercializing alternative renewable energy sources.   It considered the plant's potential impacts on forest resources, threatened and endangered species, land use patterns, cultural resources, weather, air quality, soil quality, water quality, landfills, worker safety, noise, traffic, environmental justice and aesthetics.   And it listed the public participants in the assessment, including the Fish and Wildlife Service, the Michigan Department of Transportation, the Inter-Tribal Council of Michigan and an assortment of individuals who submitted comments.

Given the nature of the project—the construction of a biorefinery using trees as "feedstock"—the assessment focused on the plant's effects on forest resources, air quality and nearby wetlands.   There is a good reason, it turns out, for constructing this kind of plant in the Upper Peninsula of Michigan:   There are a lot of trees there.   Frontier plans to purchase the feedstock for the plant—trees—through "the traditional hardwood pulpwood supply chain" in the area.  AR at 1364.   The assessment found a long-term trend of net growth in nearby forests based on two recent studies.   It then calculated the plant's demand for hardwood at 1,130,000 green tons per year—which amounts to 63% of the net annual hardwood growth "in excess of current harvest levels."   AR at 1375.   The forest resources in the area in other words would continue to increase even with the added demand created by the plant.   Frontier also plans to require its suppliers to use sustainable harvesting practices.

As for air quality, the assessment concluded that any potential increase in contaminants would not exceed allowable levels.   Construction will generate dust, which Frontier will mitigate by "road watering, temporary vegetative cover, or dust suppressants, as needed."   AR at 1412. The plant will emit air pollutants, particulate matter, nitrogen oxide, carbon monoxide and sulfur

dioxide. Relying on models that showed the air pollution would not exceed relevant standards, the assessment concluded that the plant's emissions would not significantly affect local air quality. The assessment also analyzed the plant's impact on greenhouse gas emissions and found that the plant would *reduce* net greenhouse gas emissions by 1.34 pounds of carbon dioxide equivalents per gallon of ethanol produced.

As for wetlands, the assessment concluded that neither the construction nor the operation of the plant would disturb them. One potential railroad corridor for the plant (needed if the plant expands to a 40 million gallon per year capacity) would run through wetlands. If Frontier chooses that corridor, the Michigan Department of Environmental Quality will require Frontier to mitigate the wetland loss through the construction of "compensatory" wetlands or the purchase of "mitigation bank credits." AR at 1399–400.

In the end, the assessment concluded that the environmental impacts from the plant would be minimal in the short term and that, once the plant's operations end, it could safely be decommissioned and the area returned to its pre-plant state. The assessment concluded that funding the plant "would not constitute a major Federal action significantly affecting the human environment," meaning that "preparation of an environmental impact statement is not required." AR at 1961.

Through 400 pages of analysis, the Department took a "hard look" at the environmental impacts the Frontier plant will cause and decided that those impacts did not call for a full environmental impact study. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). As a matter of process and substance, this decision was neither arbitrary nor capricious. *See Friends of Fiery Gizzard v. Farmers Home Admin.*, 61 F.3d 501, 506 (6th Cir. 1995) (upholding an agency's decision "to dispense with a full-scale environmental impact statement" reached through an "extensive environmental assessment process").

The plaintiffs offer several competing arguments. *First*, they note that the Department considered only one alternative to funding the Frontier plant: not funding it. An agency in general has wide discretion to choose the alternatives to evaluate in light of the project's purpose and environmental impacts. That is particularly true when an agency decides to prepare only an

environmental assessment, which makes any "duty to consider environment-friendly alternatives" "less pressing." *Save Our Cumberland Mountains*, 453 F.3d at 342.

At one level, it is true, the Department looked at this request for funds through the lens of two economic options—funding or not funding the plant—but that does not make its assessment arbitrary and capricious. In this instance, the Department's assessment considered, explicitly and implicitly, other possibilities. It explicitly made the mitigation measures discussed in the environmental assessment binding on Frontier through the funding agreement. That of course goes beyond just saying "yes" or "no" to a funding request. The Department also implicitly considered other alternatives. It described the three alternative sites that Frontier Renewable Resources considered for the plant. It studied the environmental impacts of a 40 million gallon per year plant, even though the federal funds supported only the 20 million gallon per year plant Frontier plans to build initially. In acknowledging that demand for some hardwoods (such as aspen) exceeds demand for others (such as basswood and oak), it explained that Frontier may vary the types of hardwood used as feedstock to avoid depleting in-demand trees. And it estimated the environmental impacts of trucking supplies to the plant to come up with a "worst case scenario," though Frontier plans to bring supplies in by train. AR at 1413. That is not an analysis preoccupied with one option.

To obtain traction on this point, moreover, plaintiffs must "identif[y] a single alternative that the agency should have considered but did not"; otherwise they cannot show that the flaw "had any chance (or still has any chance) of altering the agency's deliberations or conclusions." *Save Our Cumberland Mountains*, 453 F.3d at 347. The plaintiffs intimate without elaboration that the assessment should have considered different plant locations, plant sizes, feedstocks and supply systems. Yet, as just shown, the assessment considered these kinds of possibilities.

To the extent the plaintiffs mean to suggest that the assessment should have considered a different type of plant as an alternative, the Department had no obligation to do so. An agency must consider alternatives "within the ambit of an existing standard—say, a different scope of operation or additional mitigation measures." *Id.* at 347 (internal quotation marks omitted). An agency need not consider "a policy alternative generally—say, energy conservation in the context of a surface mining application." *Id.* (internal quotation marks omitted). An alternative

such as a different type of plant, say one that uses "canary grass" as its feedstock, Reply Br. at 16, falls within this latter category. Frontier applied for funding to build a plant that used hardwood as its feedstock because it had developed the technology to produce cellulosic ethanol from that feedstock. A plant with a different feedstock, one Frontier could not convert to cellulosic ethanol, exceeds the "reasonable alternatives" the Department had to assess. *Save Our Cumberland Mountains*, 453 F.3d at 346.

*Second*, the plaintiffs argue that the assessment did not adequately discuss the project's environmental impacts or mitigation measures. As for environmental impacts, the plaintiffs argue that the Department failed to consider the plant's impacts on forest resources, on habitats for certain species and on greenhouse gas emissions. The assessment adequately discussed each impact. Based on two studies, the assessment concluded that, despite the trees harvested for the plant's feedstock, the forest resources will experience net growth. It acknowledged that harvesting trees will disturb "flora and fauna" in the nearby forests. But it described those disturbances as occurring even in the absence of the plant (because others harvest the timber in those forests already) and as minimal (because sustainable forestry practices will "ensure that impacts to biological resources are minimized"). AR at 1373, 1377. And it calculated the point source emissions of greenhouse gases (over 450,000 tons per year) and above all the life-cycle *reduction* in greenhouse gases caused by the benefits and burdens of the plant (a net reduction of over 25,000 tons per year). That analysis provided the required "brief discussions" of each impact. 40 C.F.R. § 1508.9.

As for mitigation measures, the plaintiffs claim that those discussed in the assessment are speculative or unenforceable. Speculative is an unfair description of some of the measures. Most stem from federal or state permitting requirements. Because construction of the plant requires developing 50 acres of undeveloped land, for example, the Michigan Department of Environmental Quality will require a soil erosion and sedimentation control plan before granting a construction permit. Those plans "incorporate best management practices . . . to prevent sedimentation impacts." AR at 1430. The assessment in other words discusses future requirements the plant will have to meet to secure construction and operation permits. That those permitting requirements will take effect *sometime* in the future does not alter the reality

that they *must* take effect before construction and operation (and the resulting environmental impacts) could begin.  That makes the requirements certain, not speculative.  *Cf. Robertson*, 490 U.S. at 352–53 (explaining that the mitigation discussion in an environmental impact statement need not contain a "complete mitigation plan," especially where impacts "cannot be mitigated unless nonfederal government agencies [with jurisdiction over those effects] take appropriate action").

In criticizing another mitigation measure—the use of a "Sustainable Forestry Initiative . . . procurement process," AR at 1363—as unenforceable and vague, the plaintiffs overstate their case.  The funding agreement incorporates the mitigation measures and makes them binding on Frontier, as the environmental assessment explains.  True, the environmental assessment does not quantify the benefits of the procurement process.  But the assessment amply discusses its qualitative benefits:  the obligation to harvest timber in a sustainable manner; the requirement to provide training to loggers; the ability to inspect private lands to ensure compliance; and the duty of third parties to provide annual audits.  The assessment adds that this process continues the area's decade-long use of sustainable methods of forest resource management.

*Third*, the plaintiffs claim that the Department should have supplemented the assessment in light of a press release announcing Frontier's partnership with Valero Energy Corporation in December 2011 issued five months after the no-significant-impact finding.  Through this deal, Valero obtained an "option to expand the [plant] to up to 80 million gallons per year."  R.30-2 at 2.  An agency must supplement an *environmental impact statement* in light of "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 72 (2004) (quoting 40 C.F.R. § 1502.9(c)(1)).  Assuming for the sake of argument that the same rule applies to environmental *assessments*, any complaint about a supplemental environmental assessment is moot.  Valero, as the parties all acknowledge, recently abandoned its partnership with Frontier.  The Department need not supplement its environmental assessment to account for an unplanned expansion.

*Fourth*, the plaintiffs argue that the assessment raised sufficient concerns to require the preparation of an environmental impact statement. The relevant regulations define "significantly" (as in "significantly affecting the quality of the human environment," 42 U.S.C. § 4332(C)) by reference to ten "intensity" factors. 40 C.F.R. § 1508.27. The plaintiffs claim that the ten factors show that the plant will significantly affect the human environment. While the ten factors may show that the Department *could have* prepared an environmental impact statement, they do not show that the Department acted arbitrarily and capriciously in not completing one.

The assessment considered all of the environmental effects that the intensity factors mention. It reasonably considered the plant's effects on the environment, public health and public safety. *See id.* § 1508.27(b)(1)–(2), (7). It considered the unique characteristics of the region, including the wetlands, national parks, infrastructure and cultural resources. *See id.* § 1508.27(b)(3), (8). No threatened or endangered species, it noted, live in the area of the plant. *See id.* § 1508.27(b)(9). And the sustainable forestry procurement process, it added, protects any endangered species that live in the forests that will supply timber for the plant. Nothing in the record, moreover, suggests that the plant will cause violations of local, state or federal environmental rules. *See id.* § 1508.27(b)(10). Just the opposite: The assessment incorporates many such requirements as mitigation measures.

The project also does not raise any of the broader policy concerns that the intensity factors mention. No controversy exists over the plant's size, scope or effect. *See id.* § 1508.27(b)(4); *Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 234 (5th Cir. 2006). The plaintiffs hold onto the possibility that the plant might expand to an 80 million gallons per year capacity. But the partnership that created the premise for such an expansion has been abandoned. The record does not reveal any uncertainty over the scope or magnitude of the plant's environmental effects. *See* 40 C.F.R. § 1508.27(b)(5). The plaintiffs argue that a demonstration project by its very nature always involves uncertainty. Perhaps. But those *unidentifiable* uncertainties would remain unidentified in an environmental impact study and so do not require the preparation of one. Contrary to plaintiffs' suggestion, this assessment, tied as it is to the unique facts of this plant, does not set a precedent for future actions. *See id.* § 1508.27(b)(6).

In the final analysis, the Department completed a thorough environmental assessment of the Frontier plant and reasonably described the environmental impacts the assessment identifies as not significant.  The National Environmental Policy Act requires no more.

IV.

For these reasons, we reverse in part and affirm in part.

_____

**CONCURRENCE**

_____

JANE B. STRANCH, Circuit Judge, concurring.   The facts of this case allow for resolution of the standing issue without a lengthy review of standing doctrine as it applies to procedural rights.  Still, there is value in providing some explanation of the governing principles, and I concur to trace a bit of that law.  Injury, causation, and redressability are the basic requirements; but first, context.

Here, the Department of Energy wants to give Frontier $100 million to build an ethanol plant.  Klein lives by the proposed plant location and has a compromised immune system. The plant will pollute the air.  NEPA requires that the Department ask specifically how that pollution will affect the environment and then share its answers with the public, including Klein.  The Department cannot spend its $100 million unless it complies with NEPA.

Three principles should guide any analysis of whether a plaintiff has standing to assert a violation of procedural rights under NEPA.  First:  "Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before."  *Massachusetts v. EPA*, 549 U.S. 497, 516 (2007) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 580 (1992) (Kennedy, J., concurring in part and concurring in the judgment)); *see also Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("The . . . injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing." (internal quotation marks omitted)).   Second: "Congress has presumptively determined that the failure to comply with [NEPA] has detrimental consequences for the environment," *Save Our Cumberland Mountains v. Kempthorne*, 453 F.3d 334, 347 (6th Cir. 2006) (internal quotation marks omitted), and "countless lawsuits in which [the courts] upheld a plaintiff's standing were predicated on [the] understanding" that an agency may be persuaded to alter a project if, by complying with NEPA, "its eyes are open[ed] to the environmental consequences of its actions," *Lemon v. Geren*, 514 F.3d 1312, 1315 (D.C. Cir. 2008).  And third: the injury, causation, and redressability requirements exist primarily to prevent a court from rendering an advisory opinion, from depriving an injured party of her day in court, and, most

importantly, from assuming the powers of the executive or the legislature. *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 473–74 (1982); *see also Hein v. Freedom from Religion Found.*, 551 U.S. 587, 616 (2007) (Kennedy, J., concurring). Courts must take care to apply standing doctrine in a manner that effectuates its undergirding purposes.

These principles explain why the procedural rights NEPA provides are termed "special." *Lujan*, 504 U.S. at 573 n.7. In a NEPA case, "[t]he injury-in-fact is increased risk of environmental harm stemming from the agency's allegedly uninformed decision-making." *Sierra Club v. U.S. Army Corps of Eng'rs*, 446 F.3d 808, 816 (8th Cir. 2006); *see also Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 995 (8th Cir. 2011) (quoting *Sierra Club v. Marsh*, 872 F.2d 497, 504 (1st Cir. 1989)). Under our precedent, the injury-in-fact requirement is therefore satisfied if a plaintiff has a concrete interest that is protected by NEPA, the concrete interest is threatened by government action, and the government allegedly violated NEPA. *Friends of Tims Ford v. Tenn. Valley Auth.*, 585 F.3d 955, 968 (6th Cir. 2009). And it is nearly self-evident that the NEPA plaintiff's procedural injury is "fairly traceable" to the government. *See Ouachita Watch League v. Jacobs,* 463 F.3d 1163, 1173 (11th Cir. 2006) ("[T]he plaintiffs were harmed when their procedural rights under NEPA were violated. Since the Forest Service (according to Ouachita) failed to follow NEPA, it is clear that the Forest Service caused Ouachita's alleged injury. That is the extent of Ouachita's burden to establish causation."). Redressability is similarly straightforward: "When a litigant is vested with a procedural right, that litigant has standing if there is *some possibility* that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts*, 549 U.S. at 516 (emphasis added). NEPA compliance presumptively reduces the threat of environmental harm by increasing the chance that the government will modify—even slightly—its actions if it understands the nature and magnitude of that harm, *see Lemon*, 514 F.3d at 1315, and that is all the redressability prong requires, *see Massachusetts*, 549 U.S. at 516; *see also Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 903 (10th Cir. 2012) ("a favorable decision would relieve their problem 'to some extent,' which is all [the redressibility prong] requires"); *City of Dania Beach, Fla. v. FAA*, 485 F.3d 1181, 1186 (D.C. Cir. 2007).

NEPA and the Administrative Procedure Act therefore afford Klein a procedural right that protects his concrete interests—here, his health, which will be threatened by pollution from the ethanol plant. *See Nulankeyutmonen Nkihtaqmikon v. Impson*, 503 F.3d 18, 28 (1st Cir. 2007); *Lujan*, 504 U.S. at 573 n.8. If the Department's study was inadequate under NEPA then Klein's procedural right was violated and he has suffered an injury. *Friends of Tims Ford*, 585 F.3d at 968 (quoting *Ouachita Watch League*, 463 F.3d at 1171); *See also, Wright v. O'Day*, 706 F.3d 769, 771–72 (6th Cir. 2013); *Dismas Charities, Inc. v. U.S. Dep't of Justice*, 401 F.3d 666, 677–78 (6th Cir. 2005). This injury is directly traceable to the Department. *Comm. to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 452 (10th Cir. 1996); *see also Impson*, 503 F.3d at 28. It is precisely the type of injury a court can redress: If Klein wins the suit, a court will declare that the Department has violated Klein's procedural right and order it to comply with NEPA. *See Massachusetts*, 549 U.S. at 517–18 & 525–26. And there is unquestionably "some possibility" that the court's order might cause the Department to include modifications to the project, even slight ones, that will "to some extent" reduce the air pollution that threatens Klein's health—just as it has already done by requiring Frontier to use a biomass boiler instead of six natural gas boilers. *Id.*; *see also Consumer Data Indus. Ass'n*, 678 F.3d at 903.

Taking jurisdiction over this controversy—where the government has partnered with a private party by providing $100 million to fund a project—comports with the principles that underlie the doctrine of standing. Giving Klein a chance to protect his health by vindicating his NEPA rights will not "usurp the powers of the political branches," *Clapper v. Amnesty Int'l USA*, 133 S.Ct. 1138, 1147 (2013), will not sap "the vitality of the adversarial process" and turn the judiciary into a "rarified . . . debating society," *Massachusetts*, 549 U.S. at 517 (quoting *Lujan*, 504 U.S. at 581 (Kennedy, J., concurring in part and concurring in the judgment)), and will not allow mere bystanders—persons "trivially or not at all harmed by the wrong complained of," *Am. Bottom Conservancy v. U.S. Army Corps of Eng'rs*, 650 F.3d 652, 656 (7th Cir. 2011)—to deprive "those persons likely to be most directly affected by a judicial order" of their day in court, *Valley Forge Christian Coll.*, 454 U.S. at 473. Klein's case—litigation brought by an individual whose health is threatened by pollution from a government-funded project allegedly proceeding in violation of the National Environmental Policy Act—raises none of these

concerns; it is a "case" or "controversy" to which the judicial power "shall extend."  U.S. Const. art. III, § 2.  Klein has standing to sue.