RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0254p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

———————————

KENTUCKY COAL ASSOCIATION, INC.; JAMES ROGERS, III; J.L. ROGERS FAMILY, LLC; TALMAGE ROGERS; TALMAR OF FL, LLC; PAT EARLY; KIRSTINE EARLY; BUCKINGHAM HOLLOW, LLC; KEVIN LAWRENCE; BIG BUCKS, LLC,

　　　　　　*Plaintiffs-Appellants*,

*v.*

TENNESSEE VALLEY AUTHORITY,

　　　　　　*Defendant-Appellee*.

No. 15-5163

Appeal from the United States District Court
for the Western District of Kentucky at Owensboro.
No. 4:14-cv-00073—Joseph H. McKinley, Jr., Chief District Judge.

Argued:  October 13, 2015

Decided and Filed:  October 23, 2015

Before:  BOGGS, SUTTON, and COOK, Circuit Judges.

———————————

#### COUNSEL

**ARGUED:**  Donald J. Kelly, WYATT, TARRANT & COMBS, LLP, Louisville, Kentucky, for Appellants.  Frances Regina Koho, TENNESSEE VALLEY AUTHORITY, Knoxville, Tennessee, for Appellee.  **ON BRIEF:**  Donald J. Kelly, Lisa C. DeJaco, WYATT, TARRANT & COMBS, LLP, Louisville, Kentucky, for Appellants.  Frances Regina Koho, Maria V. Gillen, TENNESSEE VALLEY AUTHORITY, Knoxville, Tennessee, for Appellee.

———————————

**OPINION**

———————————

SUTTON, Circuit Judge.  When the Tennessee Valley Authority decided to switch from coal to natural-gas generation at one of its power plants in Kentucky, many local landowners were not happy.  They thought that the conversion would damage the local economy and harm the environment to boot.  Any judicial power to halt such a project arises only if the TVA acted arbitrarily (and capriciously) in making its decision.  Because that was not the case, any problems from the conversion are not ours to fix.  We affirm.

I.

Created during the depths of the Depression, the Tennessee Valley Authority is a federal agency that operates power plants (including three nuclear, fifteen natural-gas, thirty hydro, and ten coal plants) to provide electricity to nine million Americans in the Southeastern United States.  *See* 16 U.S.C. § 831n-4(h).  Like private power companies, the TVA must comply with the Clean Air Act.  In 2012, the Environmental Protection Agency told the TVA that it needed to reduce emissions from some of the coal-fired units at its plants, including Units 1 and 2 at the Paradise Fossil Plant in Drakesboro, Kentucky, to comply with the Act and its regulations. *See* 77 Fed. Reg. 9304, 9304–513 (Feb. 16, 2012).  In response, the TVA considered several options, including two in particular:  (1) maintaining coal-fired generation by retrofitting the Paradise units with new pollution controls and (2) switching the fuel source from coal to natural gas.  The TVA initially picked the retrofitting option but conditioned that choice on "satisfactory completion of required environmental reviews."  AR 324.

After more than a year of environmental study, the TVA changed its mind.  It decided to switch from coal to natural-gas generation at Paradise Units 1 and 2, and concluded that the conversion would be better for the environment.  The TVA issued a "finding of no significant impact" on the environment stemming from the newly configured project.

The Kentucky Coal Association, as its name hints, was not a fan of this decision.  Neither were local businesses and landowners.  Together, the three groups sued to halt the project,

alleging that the TVA exceeded its authority in making the decision. The district court denied the plaintiffs' motion for a preliminary injunction, and granted the TVA's motion for judgment on the administrative record. The plaintiffs appealed.

II.

Federal courts may "hold unlawful" an agency's action or failure to act when it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This is not an invitation for judicial second-guessing. We ask not whether the agency's decision was right but whether as a matter of process we can "reasonably [] discern[]" why the agency did what it did and whether as a matter of substance that decision was not arbitrary. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14 (2009). So long as the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action," we will not set aside its decision. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

In this instance, the plaintiffs contend that the TVA acted arbitrarily in two ways: It failed to follow the particulars of the Tennessee Valley Authority Act for making such decisions, and it failed to consider the project's environmental effects in an impact statement under the National Environmental Policy Act. We do not think so.

A.

The plaintiffs start by contending that the TVA acted arbitrarily by failing to conduct, and by failing to follow, the "least-cost planning program" required by the Tennessee Valley Authority Act. *See* 16 U.S.C. § 831m-1(a). Other than accurately describing many a family budget, what is such a program? The Act tells the TVA to "employ and implement a planning and selection process for new energy resources," such as natural gas. *Id.* § 831m-1(b)(1). That process must "evaluate[] the full range of existing and incremental resources" so as not to skip over any "new power supplies, energy conservation and efficiency [efforts], [or] renewable energy resources[]." *Id.* Through it all, the TVA must not lose sight of the imperative of providing "adequate and reliable service to electric customers of the Tennessee Valley Authority at the lowest system cost." *Id.* More particularly, the TVA's planning process must:

(1) consider "necessary features for system operation," (2) factor in its "ability to verify energy savings," and (3) "treat demand and supply resources on a consistent and integrated basis." *Id.* § 831m-1(b)(2).

In putting together its 2011 Integrated Resource Plan, the TVA fulfilled the Act's obligations. The Plan projected how best to meet the statutory mandate of providing customers with electricity at the least system cost over a twenty-year period. *See id.* § 831m-1(b)(1). In line with the Act, the Plan "evaluate[d] the full range of . . . [energy] resources," *id.*, including adding new power sources, such as natural gas, nuclear, and renewables, as well as making the existing ones more efficient. It considered "necessary features for system operation," *id.* § 831m-1(b)(2)(A), such as diversity in its energy portfolio, reliable power sources, and other risk factors. It took into account the TVA's "ability to verify energy savings," *id.* § 831m-1(b)(2)(B), when it increased energy-efficiency initiatives. And it "treat[ed] demand and supply resources on a consistent and integrated basis," *id.* § 831m-1(b)(2)(C), by considering "a broad spectrum of feasible supply- and demand-side options." AR 1702. Under any standard of review, we think it difficult to fault these efforts to follow the Act's directives.

The same is true of the TVA's Paradise decision in 2013. The decision to switch to natural gas "advances [the Plan's] goal" of "a more balanced, diverse portfolio of energy resources on the [TVA's power] system." AR 190. Due to that decision, the TVA will employ "energy resources that are cleaner than coal," diversify its energy portfolio, and balance out the use of coal on the grid given that the TVA maintains many coal-fired plants elsewhere in the region. *See id.* The decision also "increas[es] [the] amount of coal-fired capacity [to be] idled," uses "natural gas as an intermediate supply source," and adds new natural-gas generation to the grid, all again to the end of advancing the objectives of the Plan. AR 1692. The decision in the final analysis seeks to achieve "adequate and reliable service to electric customers of the [TVA] at the lowest system cost," 16 U.S.C. § 831m-1(b)(1), placing it comfortably within the requirements of the Plan and the Act.

The plaintiffs see it differently. They argue that the TVA did not follow the Plan when making the Paradise decision and claim that two facts prove the point.

The first fact is that retrofitting the plant would "cost substantially less" (at least in the short run) than switching to gas, AR 190—$19.33 less per consumer per year according to the plaintiffs. Invoking *Michigan v. EPA*, 135 S. Ct. 2699 (2015), the plaintiffs contend it was unreasonable for the TVA to pick the more expensive option. But the plaintiffs overlook the reality that the term "costs," before and after *Michigan*, means more than dollars and cents. *Id.* at 2707. Yes, it includes "all direct and quantifiable net costs for an energy resource over its available life, including the cost of production, transportation, utilization, waste management, [and] environmental compliance." 16 U.S.C. § 831m-1(b)(3). But it also includes "harms that [a decision] might do to human health or the environment." *Michigan*, 135 S. Ct. at 2707. The TVA considered all of these costs when making the Paradise decision, and it reasonably concluded that its decision would do more good than ill when measured by these considerations. *See id.* That suffices to uphold its decision.

The plaintiffs also rely on the fact that the Paradise decision contributes to the TVA's shutting down ("idling") about 7,000 megawatts of coal generation across its system, even though the Plan recommends idling only up to 4,700 megawatts of system-wide coal generation. The TVA, the plaintiffs claim, has no authority to "simply disregard rules" that it previously created. *Fox*, 556 U.S. at 515. But the TVA did not disregard the Plan in making the Paradise decision. In addressing the point, it helps to clarify what the Plan does and what it does not do. The Plan creates broad "strategy alternatives" and provides "guideline ranges for key components" of the TVA's entire power system. AR 1845. It "does not dictate a specific series of actions" or "[f]inalize specific asset decisions" at particular plants. *Id.* It thus sets nothing in stone about the appropriate amount, even the appropriate range, of coal or natural-gas generation across the entire system, much less at the Paradise plant in particular. The Plan gave the TVA freedom to "fine-tun[e]" system-wide processes to develop specific policy choices at specific locations, *id.*, which is what the TVA did when picking its best option at the Paradise plant.

Even if the Plan gave the TVA some leeway in this area, the plaintiffs add that the Plan's guideline range for coal idling limited that flexibility. If an agency announces "a general policy by which its exercise of discretion will be governed," an "irrational departure from that policy" could "constitute action that must be overturned as 'arbitrary, capricious, [or] an abuse of

discretion.'" *INS v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996). True enough. But the TVA's decision hardly seems like such a "departure" from the Plan (far less an irrational one) because the Plan considered coal idling above the guidelines—even to the amount caused by its coal-idling decisions—and expressly kept open the possibility of such idling. More to the point, the decision to idle more coal than the recommendation was consistent with the Plan's findings. The Plan found that "[c]oal-fired plant idling," including idling that "*exceeds* the upper end of the [guideline] range," is "essential for [the TVA] to provide cleaner energy" and will *reduce* the environmental impacts of power generation across the grid. AR 1844, 2355 (emphasis added). Although the Plan noted that the TVA should perform more studies on the proper amount of coal idling, the TVA *has* performed studies through its site-specific environmental assessments before deciding to idle these and other units. All in all, the TVA did not act arbitrarily or contravene the Tennessee Valley Authority Act in switching from coal to natural gas at the Paradise Plant.

B.

The plaintiffs cut back in the other direction in making their second argument. Having first argued that the TVA was overly sensitive to environmental considerations, they next claim that the TVA was insufficiently attentive to them. They maintain that the TVA acted arbitrarily by failing to "carefully consider" the effect on the environment of the Paradise decision through an environmental impact statement under the National Environmental Policy Act. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989); *see* 42 U.S.C. § 4332(2)(C). If an entity proposes a federal course of action that may significantly impact the environment, the federal agency that controls the project must conduct an environmental assessment that evaluates "the environmental impacts of the proposed action and alternatives" and determines whether the agency needs to conduct further study. 40 C.F.R. § 1508.9; *see id.* § 1501.4(b). If the assessment shows that the agency's actions will not have "a significant effect on the human environment," the agency may issue a "[f]inding of no significant impact" and move on with its plans. *Id.* § 1508.13. If the assessment shows that the action will (or may) have a significant impact on the environment, the agency must prepare an "environmental impact statement" before taking any action. *Id.* § 1501.4(c); *see id.* § 1502.3.

The agency has "considerable discretion" in determining whether an environmental assessment should lead to an impact statement. *Klein v. U.S. Dep't of Energy*, 753 F.3d 576, 580 (6th Cir. 2014). And we review the decision not to prepare one under the "arbitrary and capricious" standard. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 763 (2004).

The TVA acted within its discretion in preparing only an environmental assessment. Its 165-page assessment explored a wide range of environmental issues before concluding that switching to natural gas would not have a significant (negative) impact on the environment. The TVA adhered to the process laid out in the regulations and came to a reasoned conclusion, precluding us from setting it aside.

*Process*. The TVA took the requisite "hard look" at the effects of its proposed action. *Robertson*, 490 U.S. at 350. Over the course of fifteen months, the TVA considered the natural-gas plant's potential impact on several areas, including air quality, climate change, surface water, floodplains, recreational areas, cultural and historic resources, socioeconomic and environmental justice, solid waste, groundwater, geology, biological resources, land use, farmland, transportation, hazardous waste, and noise pollution. For each of these topics, the TVA's assessment described the status quo and analyzed the consequences of retrofitting the units in comparison to switching to natural gas. The assessment also described the mitigation measures the TVA would take to address any possible environmental consequences. When considering the impact on air quality, to take one example, the assessment determined that switching to natural gas would have minor, temporary negative effects (due to construction of the new units), but that "the cumulative impact of the [switch to gas] would be positive." AR 196. It did the same thing for eighteen other environmental issues. And it listed its interaction with public participants, including state and federal officials and a variety of individuals who submitted comments. That's all the Act asks of the TVA in this respect, *see Klein*, 753 F.3d at 581–82, and that's just what it did.

*Substance*. In the aftermath of this study, the TVA reasonably concluded that switching to gas would not have a significant impact on the environment. It found that the conversion would have a net positive impact in a number of areas, especially when compared to retrofitting the coal-fired units. Switching to gas for example would significantly reduce emissions,

wastewater discharges, hazardous waste, transportation costs, and overall costs for energy production. Although there would be some negative impacts in areas like vegetation, these would be minor and could be mitigated by the measures identified in the assessment. The TVA permissibly concluded that any negative impacts did not rise to the level—"significant"—that would require an impact statement. *See Klein*, 753 F.3d at 584; 40 C.F.R. § 1508.27(a), (b).

All perspectives considered, the TVA "adequately studied the issue and [took] a hard look at the environmental consequences of its decision." *Save Our Cumberland Mountains v. Kempthorne*, 453 F.3d 334, 339 (6th Cir. 2006). As a matter of process and substance, the TVA did not act arbitrarily or capriciously in declining to undertake a full environmental impact statement. *See Klein*, 753 F.3d at 582.

The plaintiffs make several counterarguments. None convince. *First*, they contend that, because the TVA's regulations "normally . . . require" an impact statement before building a major power-generating facility like this one, AR 370; *see* 40 C.F.R. §§ 1501.4(a)(1), 1507.3(b)(2), the TVA committed procedural error by not issuing one here. Normally does not mean always. *Shahid v. Ford Motor Co.*, 76 F.3d 1404, 1414 (6th Cir. 1996). The TVA retains discretion to prepare only an assessment even when it normally would do otherwise as long as it takes the required close look at its actions. *See Kempthorne*, 453 F.3d at 339; 48 Fed. Reg. 34263, 34265 (July 28, 1983). That is the touchstone of our review. And because the fifteen-month, 165-page environmental assessment did just that, this regulation does not change the outcome, as other courts have concluded in comparable circumstances. *E.g.*, *City of Dallas v. Hall*, 562 F.3d 712, 722 (5th Cir. 2009); *Comm. to Pres. Boomer Lake Park v. Dep't of Transp.*, 4 F.3d 1543, 1554–55 (10th Cir. 1993).

The TVA, as it turns out, had ample grounds for not following its "normal" course here. For one thing, its decision aligns with past practice. The TVA prepares an impact statement as a matter of course when it builds a new plant on an *undeveloped* site. *See, e.g.*, 64 Fed. Reg. 29935, 29935 (June 3, 1999). But it does not always prepare an impact statement when, as here, it builds new units on an existing site. For another thing, the TVA *did* prepare an impact statement when it issued its 2011 Plan, and that statement extensively covered some of the same issues that concern the plaintiffs today. The TVA's assessment built ("tiered" in agency lingo)

from that 2011 impact statement by "incorporating by reference [its] general discussions and concentrating solely on the issues specific to" the Paradise plant. 40 C.F.R. § 1508.28. The regulations not only allow such tiering; they encourage it and indeed in some cases require it. *Id.* §§ 1500.4(i), 1502.20. The TVA did not act arbitrarily by following its past practice and tiering its assessment.

*Second*, the plaintiffs contend that the TVA ignored the effects of a necessary part of its plan: building a natural-gas pipeline. We disagree. The TVA considered the cumulative impact of all "closely related" actions, including building a natural-gas pipeline to reach the newly configured plant. *Id.* § 1508.25(a)(1); *see Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976). The assessment's scope "include[d] [the] potential natural gas pipeline corridors within which a gas pipeline(s) may be located by the gas supplier." AR 167. Consistent with that scope, the assessment considered the pipeline's impacts in the nineteen environmental areas it studied. Even though the pipeline would disturb some vegetation, to use one example, the TVA concluded that it and the power plant *together* would have "no significant cumulative impacts" on vegetation. AR 203. The eighteen other areas were no different, as they produced no significant cumulative impact on the environment.

It also is hard to fault the TVA for not doing more. At the time of its assessment—"the earliest possible time" it could study the environmental effects of its actions, 40 C.F.R. § 1501.2—the pipeline route had not yet been approved. A different federal agency, the Federal Energy Regulatory Commission, approves pipeline routes. That agency may not merely rubber-stamp the TVA's decision but instead must "act as the lead agency" in performing another environmental study in connection with that approval. 15 U.S.C. § 717n(b)(1); *see also id.* § 717f. If that environmental study does not suffice, the plaintiffs are free to sue that agency. But the plaintiffs cannot blame this agency—the TVA—which has "limited statutory authority" over the pipeline route. *See Pub. Citizen*, 541 U.S. at 770. The TVA used the information it had at the time to fully consider the environmental impacts of the plant *and* the pipeline.

*Third*, the plaintiffs accuse the TVA of prejudging the switch to natural gas before completing its environmental study. That overstates what happened and what the law requires. An agency may have a preferred alternative so long as it does not "[l]imit the choice of

reasonable alternatives" to pick the one it likes. 40 C.F.R. § 1506.1(a)(2); *see Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 206 (4th Cir. 2005). That's all that happened. The TVA preferred switching to natural gas but did not limit its alternatives. It considered ten other options, some of which were feasible and reasonable. Yes, the TVA could have picked the option that the plaintiffs preferred (maintaining coal), but that does not mean that it could not pick the option that *it* preferred: switching to natural gas. *Cf. Klein*, 753 F.3d at 584.

*Fourth*, the plaintiffs predict that the switch to natural gas will have devastating socioeconomic effects on the surrounding community—from "job loss and increased unemployment" to "potential outmigration of industry" and "higher poverty rates"—and contend that these potential effects required an environmental impact statement. Appellants' Br. 11. Not so. The regulations, for better or for worse, say that "economic or social effects are not intended by themselves to require preparation of an environmental impact statement." 40 C.F.R. § 1508.14. We have echoed the point: The National Environmental Policy Act is "not a national employment act," and its "[e]nvironmental goals and policies were never intended to reach social problems such as those presented here." *Breckinridge v. Rumsfeld*, 537 F.2d 864, 867 (6th Cir. 1976). The TVA at any rate *did* consider these and other socioeconomic effects and concluded that, while some negative effects may result (such as a 2% reduction in the county's workforce), they would not *significantly* affect the human environment. That decision was reasonable in light of the regulations and our precedent.

*Finally*, plaintiffs argue that the retrofitting option would have been a much better policy choice, as it would save money, help the environment, and support the local economy. Maybe; maybe not. Either way, "arbitrary and capricious review does not ask who is right." *St. Marys Cement Inc. v. EPA*, 782 F.3d 280, 286 (6th Cir. 2015). It asks whether "there are good reasons for the new policy." *Fox*, 556 U.S. at 515. Once the agency has satisfied this obligation, "it need not [also] demonstrate to [our] satisfaction that the reasons for the new policy are *better* than the reasons for the old one." *Id.* The TVA did not act arbitrarily in switching the Paradise plant to natural gas.

For these reasons, we affirm.