NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0767n.06

Case No. 14-2444

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Nov 24, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| PARTNERS IN FORESTRY | ) | |
| COOPERATIVE; NORTHWOOD | ) | |
| ALLIANCE, INC.; JOE HOVEL; ROD | ) | |
| SHARKA; SHERRY ZOARS; STEVE | ) | ON APPEAL FROM THE UNITED |
| GARSKE; RICH SLOAT; SID HARRING; | ) | STATES DISTRICT COURT FOR |
| CATHERINE PARKER, | ) | THE WESTERN DISTRICT OF |
| | ) | MICHIGAN |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES FOREST SERVICE; | ) | |
| ROBERT D. DELICH; LISA DELICH, | ) | |
| | ) | |
| Defendants-Appellees. | ) | OPINION |

BEFORE: ROGERS and DONALD, Circuit Judges; ROSE, District Judge.[*]

**BERNICE BOUIE DONALD, Circuit Judge.** The plaintiffs-appellants are two nonprofit organizations and seven individuals (collectively, "appellants") with connections to Michigan's Ottawa National Forest. They filed suit against the United States Forest Service ("Forest Service") as well as Robert D. Delich and Lisa Delich, seeking declaratory and injunctive relief with respect to a proposed land exchange between the Forest Service and the Deliches. The appellants advance two central claims: (1) that in considering the land exchange,

---

[*]The Honorable Thomas M. Rose, United States District Judge for the Southern District of Ohio, sitting by designation.

the Forest Service violated the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 *et seq.*, and its regulations and (2) that the district court erred in striking a land appraisal from the administrative record. We disagree and **AFFIRM** the judgment of the district court.

## I.

The Ottawa National Forest covers almost one million acres in Michigan's Upper Peninsula and offers numerous recreational activities. During the Great Depression, the Forest Service acquired large tracts of tax-delinquent land that are now part of the Ottawa National Forest. However, these tracts are interspersed among privately-owned land, some of which is used for industrial logging. As part of the Ottawa National Forest's 2006 Land and Resource Management Plan, the Forest Service intends to "[a]djust land ownership to facilitate restoration, protection, and management of resources." App. 254, 695, 697. Its priorities include "more efficient land ownership patterns" and "lower management costs." App. 254. Additionally, the Forest Service Strategic Plan's goal is to provide "an opportunity for more efficient timber management and for public use by conveying several parcels of land where the Forest Service has no legal access, while acquiring lands where [the] Forest Service has legal access." App. 254.

In February 2007, the Deliches proposed a land exchange between them and the Forest Service. The Deliches offered to exchange one large parcel of approximately 421 acres of land for seven smaller parcels of federal land, amounting to approximately 320 acres. The Deliches' land, parcel 8, is adjacent to other Forest Service lands, while the federal land—parcels 1 through 7—are interspersed among private land. Thus, the Forest Service concluded that the proposal would further its goal of reducing resources spent on managing land.

In compliance with NEPA, in January 2010 the Forest Service conducted an Environmental Assessment ("EA"). NEPA's regulations allow an agency to develop an EA to determine whether a more thorough Environmental Impact Statement ("EIS") is necessary. *See* 42 U.S.C. § 4332(2)(C) (requiring "a detailed statement" of the environmental impact of large government projects); 40 C.F.R. § 1501.4(b) (allowing agencies to initially develop an EA in lieu of an EIS if the EIS is not mandatory in the given context or not evidently required); *Klein v. U.S. Dep't of Energy*, 753 F.3d 576, 580 (6th Cir. 2014). If an EA's findings indicate that the project will not have a significant impact on the human environment, then an EIS is not required. § 1501.4.

Based on the EA's findings, the Acting Forest Supervisor issued a Decision Notice and Finding of No Significant Impact ("FONSI"). *See* § 1501.4(e). In the FONSI, the Acting Forest Supervisor determined that the land exchange would not have significant impact on the surrounding human environment. Therefore, the Forest Service concluded that it was not required to conduct the more intensive EIS.

The appellants administratively appealed the EA. A reviewing officer assigned to the appeal concluded that the EA did not adequately consider the land exchange's effect on hemlock and potential old growth. In response, the Forest Service conducted additional research and issued a Revised EA. Based on the Revised EA, in December 2011 a different Forest Supervisor issued another FONSI, concluding that there was no significant impact to the human environment and that an EIS was not required. The appellants again administratively appealed. A reviewing officer affirmed the FONSI, but he excluded from the land exchange federal land parcels 5 and 6 "in order to achieve a more balanced land value of the parcels involved." App.

254-55, 301-02. This change resulted in a total land exchange of 240 acres of federal land for 421 acres of the Deliches' land.

After exhausting their administrative remedies, on April 27, 2012, the appellants filed suit against the Forest Service and the Deliches.[1] In a motion for summary judgment, the appellants asserted that the Forest Service violated NEPA's procedural requirements in four ways. First, the appellants argued that the land exchange could result in a significant environmental impact, which would require the Forest Service to conduct an EIS. Second, the appellants claimed that the Forest Service failed to analyze an adequate number of alternatives. Third, the appellants alternatively asserted that even if an EIS was not required in this instance, the Revised EA did not adequately analyze the environmental impacts of the land exchange. Finally, the appellants claimed that the Forest Service should have conducted a more thorough analysis of new information brought to its attention after the completion of the Revised EA.

The Forest Service and the Deliches opposed the motion for summary judgment and requested judgment in their favor. They also moved to strike the appellants' submission of a land appraisal that was not in the administrative record. The district court concluded that the Forest Service did not act arbitrarily or capriciously and issued judgment in the Forest Service's and the Deliches' favor. It also granted the motion to strike the land appraisal from the record. The appellants timely appealed.

## II.

Because this appeal requires review of an agency's final decision, the Administrative Procedure Act applies. 5 U.S.C. § 706. We may only overturn an agency's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

---

[1]The appellants named the Deliches "solely for the purposes of obtaining effective injunctive relief." *Partners in Forestry Coop. v. U.S. Forest Serv.*, 45 F. Supp. 3d 677, 681 n.4 (W.D. Mich. 2014).

§ 706(2)(A). The Supreme Court instructs us that an agency's decision is arbitrary or capricious if

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of the agency expertise.

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Additionally, we apply deference to an agency's final decision. *Meister v. U.S. Dep't of Agric.*, 623 F.3d 363, 370 (6th Cir. 2010) (explaining "that the question of *whether* a certain procedure is required in a particular circumstance, or whether a certain methodology satisfies the procedure, is often left to the agency's discretion").

Under these circumstances, we review a district court's grant of summary judgment to a federal agency de novo. *Sierra Club v. Slater*, 120 F.3d 623, 632 (6th Cir. 1997). Summary judgment is granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Congress passed NEPA to establish a "national policy [to] encourage productive and enjoyable harmony between man and his environment." 42 U.S.C. § 4321. NEPA demands that agencies meet certain procedural requirements, rather than particular substantive outcomes. *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 756-57 (2004). These procedural requirements obligate "agencies to undertake analyses of the environmental impact of their proposals and actions." *Id.* Specifically, NEPA requires agencies to compose an Environmental Impact Statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An EIS includes

> a detailed statement by the responsible official on—
> (i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
(iii) alternatives to the proposed action,
(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

*Id.*

However, before engaging in this "hard look" analysis, NEPA's regulations allow agencies to begin with an Environmental Assessment (EA). § 1501.4(b); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); *Save Our Cumberland Mountains v. Kempthorne*, 453 F.3d 334, 339 (6th Cir. 2006). An EA is a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS]." 40 C.F.R. § 1508(a). If an agency concludes that the environmental effects of a proposed program will not be significant, then the agency may issue a FONSI. *Id.* A FONSI "briefly presents the reasons why the proposed agency action will not have a significant impact on the human environment." *Public Citizen*, 541 U.S. at 758-59 (citing §§ 1501.4(e), 1508.13). If, on the other hand, the EA indicates that "further study is required, the agency" must prepare an EIS. *Klein*, 753 F.3d at 580.

A reviewing court does not consider "whether the agency correctly assessed the proposal's environmental impacts." *Id.* at 580-81. Rather, "[t]he role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary and capricious." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97-98 (1983).

**III.**

Here, there is no dispute that the proposed land exchange qualifies as a "major federal action[]" requiring a NEPA analysis. On appeal, the appellants reassert that the Forest Service committed four NEPA procedural violations: (1) the Forest Service should have conducted an EIS; (2) the Forest Service did not review an adequate number of alternatives; (3) the Revised EA was not adequately informative; and (4) the Forest Service should have conducted further analysis of new information discovered after it issued the Revised EA. We address each in turn.

**A.**

The appellants first argue that the Forest Service should have conducted an EIS because, in their view, the record demonstrates that the land exchange may have a significant impact on the environment. NEPA's regulations state that whether a project is "significant" requires agencies to consider both the "context" and the "intensity" of the project. § 1508.27. The appellants argue the agency failed to adequately consider two of the ten "intensity" factors. We note that "[a]n agency decision, based on an EA, that no EIS is required, can be overturned only if it is arbitrary, capricious, or an abuse of discretion." *Crounse Corp. v. Interstate Commerce Comm'n*, 781 F.2d 1176, 1179 (6th Cir. 1986). Still, that decision must be "reasonable under the circumstances, when viewed in the light of the mandatory requirements and the standard set by" NEPA. *Kelley v. Selin*, 42 F.3d 1501, 1519 (6th Cir. 1995) (internal quotation marks and citation omitted) (quoting *Lower Alloways Creek Twp. v. Pub. Serv. Elec. & Gas Co.*, 687 F.2d 732, 742 (3d Cir. 1982)).

**i.**

The appellants contend that the Forest Service did not adequately examine the intensity factor as described in 40 C.F.R. § 1508.27(b)(3), which requires an agency to consider the

"[u]nique characteristics of geographic areas such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas." Specifically, the appellants allege that the federal land to be transferred to the Deliches is "[u]nique" based on "1) old growth cedar/hemlock; 2) boulders, rock ledges, cliffs, and vegetation which are unusual for the Ottawa; and 3) the proximity of Wildcat Falls to the communities of Eagle River, Land [O'] Lakes, and Watersmeet." Appellants' Br. 19.

The administrative record reflects that the agency reasonably considered the uniqueness of the old growth. An Appeal Deciding Officer rejected the original EA, asserting that more analysis was needed regarding the loss of old growth. The Revised EA then reconsidered and acknowledged the Forest Service's goal of maintaining a forest-wide amount of old growth between eight and ten percent, with a current level of 7.7%. The EA noted that the land exchange would remove 61 acres of old growth from the public forests, which the Forest Service explained would result in a less than 0.3% reduction in total old growth acreage. The Forest Service also explained that 71 acres of the Deliches' land could potentially be reclassified as old growth in the future. The agency's overall conclusion was that "the cumulative effect from reduction of 61 acres, or less than 1% of old growth, would be minor and would not cause a substantial change." App. 174. Additionally, in issuing a FONSI decision, a reviewing officer concluded that the old growth, cedar, and hemlock in the land were not unique to the Ottawa. Nothing in the record suggests that the Forest Service acted unreasonably or arbitrarily and capriciously in concluding that the land exchange would have a minor effect on old growth within the Ottawa.

The appellants next contend that the "boulders, rock ledges, cliffs, and vegetation [] are unusual for the Ottawa." Appellants' Br. 19. Various documents in the appendix note the

existence of rocks and cliffs. A comparison of the natural features of each land parcel states that federal parcels 2 and 3 have "rock wall/outcrop," while the Deliches' parcel does not. However, nothing in the record indicates that these various rock formations are unique. Additionally, the Forest Service found that certain rock formations at issue here would remain due to an inability to log the area.

The Revised EA also reasonably considered the land exchange's effect on vegetation. Specifically, it reviewed the content of the land parcels for vegetation, rare plants, and non-native invasive plants. The Revised EA found that there would be an overall net increase in acreage of vegetation, even though there would be a small change in the types of vegetation; that none of the areas in the land exchange exhibited rare plants; and that the overall risk of introducing non-native invasive plants is low.

Finally, the appellants are concerned about the transfer of Wildcat Falls to private hands. They stress the importance of Wildcat Falls (along with nearby Scott and Howes Creek) to the surrounding community. However, contrary to the appellants' assertions, the Revised EA acknowledges the popularity of Wildcat Falls within the community, calling it "[t]he most notable recreation experience" and emphasizing its attraction to "many" individuals. App. 186-87. The Revised EA also concedes that "[t]he viewing of natural features is focused almost exclusively on Wildcat Falls." App. 187. At the same time, the Revised EA noted two offsetting factors: (1) that there were additional locations within the Ottawa that have "similar recreation experiences" and (2) that the addition of the Deliches' parcel would contribute semi-primitive non-motorized ("SPNM") recreation to Ottawa. App. 189. Furthermore, the reviewing officer issuing the FONSI concluded that Wildcat Falls were not so unique "in [regard] to their particular form or character" as to warrant a significant impact finding. App. 260. He explained

that Wildcat Falls did not present a historical significance and that "similar sites may be found in many places in the Upper Peninsula." *Id.* The appellants recognize that another waterfall is about 70 miles away.

In sum, the appellants assert that these characteristics make the federal land "unique," but the record demonstrates that the agency reasonably concluded that they were not. Accordingly, the district court properly determined that the Forest Service did not act arbitrarily or capriciously in considering the uniqueness factor under § 1508.27(b)(3).

**ii.**

The second "intensity" factor the appellants raise is outlined in 40 C.F.R. § 1508.27(b)(4), which states "[t]he degree to which the effect on the quality of the human environment [is] likely to be highly controversial." As the Fourth Circuit first held in *Rucker v. Willis*, 484 F.2d 158, 162 (4th Cir. 1973), "controversial" refers "to cases where a substantial dispute exists as to the size, nature or effect of the major federal action rather than to the existence of opposition to a use." *Id.*; *see also Hillsdale Ent'l Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1181 (10th Cir. 2012) (articulating the same standard); *Town of Cave Creek v. Fed. Aviation Admin.*, 325 F.3d 320, 331 (D.C. Cir. 2003) (same). This definition is necessary, as the Fourth Circuit explained, because "to require an impact statement whenever a threshold determination dispensing with one is likely to face a court challenge would surrender the determination to opponents of a federal action, no matter whether major or not, nor how insignificant its environmental effect might be." *Id.*

The appellants argue that it is unknown whether and to what extent the Deliches will log the land they receive in the exchange. The appellants also protest the Forest Service's assumption that the Deliches' logging practices would follow Michigan's Best Management

Practices (BMPs), as those standards are voluntary. Consequently, the appellants argue that the project is controversial based on its speculative nature.

However, the appellants' assertion that the Deliches' logging intentions are unknowable is contrary to the record and the Forest Service's analysis. The beginning of the Revised EA states that the Deliches' intentions are as follows:

> ● Conducting timber harvest within parcels 1 through 5, with an emphasis on selection harvest. Further, [the Deliches stated their] intention would be to subdivide the 40-acre parcel comprising parcel 1 into 5-acre lots for individual sale.
> ● Retaining parcel 6 until a time when it can be sold.
> ● Conducting a selection harvest within parcel 7 and retaining it for [Robert D. Delich's] own recreation purposes (i.e., hunting).

App. 156. The Forest Service relied on these assumptions throughout the Revised EA. Additionally, the Revised EA explained that Michigan would engage in enforcement action if a company logged without meeting BMPs and pollution resulted. The Revised EA then acknowledged the potential impact that non-BMP logging would have on the environment— namely, that it "could result in impacts to water quality." App. 178. The Forest Service's Aquatic Specialist Report noted that there was potential for adverse effects if BMPs are not followed and outlined what those would be in both the cumulative effects section and the direct and indirect effects section of the Report. Specifically, the Report noted potential "adverse impacts on aquatic species population dynamics" in parcels 2, 3, and 4. App. 18. It also noted "slight" and "small" effects from pollution on the lake and streams from development. App. 18-19. Thus, the record analyzes the Deliches' logging intentions as well as the effects of logging with Michigan's BMPs and without. The appellants do not suggest a flaw in the Forest Service's reasoning. Therefore, the Forest Service did not act arbitrarily or capriciously in finding that the land exchange was not controversial due to the potential effects of logging.

**B.**

The appellants next argue that the Forest Service failed to examine an adequate number of alternatives to the land exchange. As part of an EA, a federal agency must consider "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C)(iii). NEPA's regulations require the agency to "include brief discussions of the . . . environmental impacts of the proposed action and alternatives." § 1508.9(b). Agencies do not have to consider "every conceivable alternative to the proposed action." *Kentucky ex rel. Beshear v. Alexander*, 655 F.2d 714, 718 (6th Cir. 1981) (analyzing the requirements for an EIS). Rather, the number of alternatives that an agency considers is within its discretion, as long as it takes into account the project's purpose and environmental consequences. *Save Our Cumberland Mountains*, 453 F.3d at 343. Agencies have to consider only reasonable alternatives. *Id.* at 346. Indeed, "the concept of alternatives must be bounded by some notion of feasibility." *Vermont Yankee Nuclear Power Corp. v. Natural Res. Defense Council, Inc.*, 435 U.S. 519, 551 (1978); *see Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Engr's*, 524 F.3d 938, 955 (9th Cir. 2008) (articulating a standard that allows agencies to reject alternatives that are "similar to alternatives actually considered, or alternatives which are infeasible, ineffective, or inconsistent with the basic policy objectives for the management of the area"). Finally, "[w]hen an agency permissibly identifies few if any environmental consequences of a project, it correspondingly has fewer reasons to consider environmentally sensitive alternatives to the project." *Save Our Cumberland Mountains*, 453 F.3d at 343.

Here, the Forest Service reviewed two alternatives and declined to seriously consider two other alternatives. The first alternative was a "No Action" alternative, where the land exchange would not occur and "current management plans would continue to guide management of the

project area." App. 155. The second alternative was the land exchange. In addition, the Forest Service did not seriously consider two other alternatives. The Forest Service declined to consider excluding parcels 1 and 3, which contained Wildcat Falls and Scott and Howes Creek, because "the opportunity to consolidate [Forest Service] land and concentrate on resource management efforts in more effective blocks of land would not be achieved." App. 157. In addition, the Forest Service declined to consider purchasing the Deliches' land outright because the Deliches were not interested in such a proposal. The agency also noted that "current levels of appropriate funding for acquisitions would prevent the purchase from occurring." *Id.*

The appellants claim that the Forest Service's consideration of only two proposals—the No Action alternative and the land exchange—was insufficient to fulfill NEPA's requirement to review alternative proposals. However, the Revised EA clearly shows that the Forest Service considered four alternatives, although only two in depth. It rejected excluding parcels 1 and 3 from the land exchange because that alternative was ineffective. The Forest Service also rejected purchasing the land outright because it was infeasible.

The appellants complain that the Forest Service removed parcels 5 and 6 from the exchange, which were significantly less valuable to the surrounding community than parcels 1 and 3. They assert that the Forest Service improperly removed these parcels because they "did not meet the interests of Mr. Delich." Appellants' Br. 25. *See Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058 (9th Cir. 2010) (finding that a project was unreasonably narrowed so that it met private, and not public, needs). The Revised Decision Notice and FONSI finding does indicate that parcels 5 and 6 were not of interest to Mr. Delich. However, the Forest Service excluded parcels 5 and 6 in furtherance of "the goals and objectives of the Forest Plan" because they "were originally added to the proposal in order to provide value,

but in the final appraisal added more than was necessary." App. 255. Accordingly, the agency did not act arbitrarily or capriciously when making this decision, despite its acknowledgment of the Deliches' interests. The agency considered its own goals and objectives.

The appellants further allege that the Forest Service's actions were inconsistent with *Muckleshoot Indian Tribe v. United States Forest Service*, 177 F.3d 800 (9th Cir. 1999). However, *Muckleshoot* addresses alternatives in the context of the more serious Environmental Impact Statements, not EAs. *Id.* at 809. Even if that were not the case, the appellants improperly rely on *Muckleshoot*. Contrary to *Muckleshoot*'s conclusion that it is improper to limit potential projects solely to those involving land exchanges, *id.* at 814, n.7, the Forest Service here considered and rejected an alternative to buy the land outright based on Deliches' position that they would only consider the land exchange and on the notion that buying the land would not be in furtherance of the Forest Service's land management goals.[2] Accordingly, the Forest Service did not improperly exclude all considerations except land exchanges.

Ultimately, the record demonstrates that the Forest Service seriously considered two feasible and effective alternatives and validly rejected two infeasible or ineffective alternatives. Accordingly, the agency did not act arbitrarily or capriciously when, in its discretion, it considered these alternatives.

## C.

Third, the appellants alternatively argue that even if an EIS was not required, the Forest Service's Revised EA failed "to adequately analyze the direct, indirect, and cumulative effects of the land exchange on various parts of the environment." Appellants' Br. 32. An EA must

---

[2]The appellants claim that this "assertion is not found in the record itself and is a *post hoc* position, which is not entitled to any deference." Appellants' Br. 29. Even if that were the case, there is no evidence that the Forest Service limited achieving its goal of reducing resources spent on management of federal lands to only land exchanges. Accordingly, the appellants have not shown the limiting factor as outlined in *Muckleshoot*, 177 F.3d at 814, n.7.

"provide sufficient evidence and analysis" to adequately demonstrate the project's environmental impact. 40 C.F.R. § 1508.9(a)(1). NEPA's regulations further explain that an EA considers the cumulative impact as well as both the direct and indirect effects of a project. *See* §§ 1508.7, 1508.8. A cumulative impact is "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." § 1508.7. Along the same lines, direct effects are those that "are caused by the action and occur at the same time and place," while indirect effects are those "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." § 1508.8.

> The district court aptly discussed the Revised EA's consideration of such impacts:

> There is no dispute that Chapter 3 of the Revised EA includes discussions on the direct, indirect, and cumulative environmental impacts of the proposed exchange on Wildcat Falls, perennial streams, old growth hemlock and other native species, and recreational interests. The discussion of environmental consequences in the Revised EA is supported by dozens of investigations, surveys, evaluations, reports, photographs, and maps submitted by specialists in the various resource areas, and by extensive references to the relevant literature consulted. Defendant also responded to public comments, which involved further consideration of the Project's impacts.

*Partners in Forestry Coop. v. U.S. Forest Serv.*, 45 F. Supp. 3d 677, 687 (W.D. Mich. 2014) (internal citations removed).

The appellants again assert that the Forest Service did not consider these impacts with regard to Wildcat Falls and perennial streams, old-growth hemlock and other native species, and recreational importance. First, they argue that the Forest Service improperly dismissed concerns about the loss of Wildcat Falls in the exchange. However, as we have already shown, the Forest Service did consider the loss of Wildcat Falls, and it noted that other, similar waterfalls existed nearby.

In addition to their concerns about Wildcat Falls, the appellants assert that the Forest Service failed to adequately consider the effects of the land exchange on perennial streams. The appellants stress an aquatic specialist's observations that pollution, as a byproduct of development, could cause an environmental problem. Yet the Revised EA recognized the potential problem and concluded that "the effect would be unnoticeable due to the small affected area." App. 206.

The appellants' other arguments are similarly unconvincing. First, they assert that "the land exchange runs contrary to the 2006 Final Forest Plan." Appellants' Br. 34. However, one of the goals listed in the Final Forest Plan is to "[p]rovide a semi-primitive non-motorized recreational environment," which is exactly what the Deliches' land will do according to the Forest Service. App. 157. Second, the appellants claim that the trade will cause a loss in acreage of old-growth. The Forest Service readily concedes the loss and instead concludes that the difference is negligible, with a 0.3% decrease in overall acreage, and further notes that certain areas of the Deliches' land could, in the future, be reclassified as old growth. Finally, the appellants argue that the land exchange would result in a lack of recreational opportunity, as the Deliches recently logged parcel 8. However, the Revised EA acknowledged the recently-logged condition of parcel 8. In issuing the FONSI, the reviewing officer concluded that the land exchange was still in line with the Forest Service's goals and more beneficial than maintaining the status quo. As we noted above, bringing such recreation to the Ottawa is in line with the Forest Service's 2006 Final Forest Plan. Therefore, the Forest Service did not act arbitrarily or capriciously analyzing any of these issues.

**D.**

Fourth, the appellants contend that the Forest Service should have prepared a Supplemental Impact Statement after discovering information that they assert would affect the proposed land exchange's environmental analysis. NEPA requires a supplemental analysis for an EIS—not an EA—if there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(h). Agencies are not required to conduct a supplemental NEPA analysis "every time new information comes to light." *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 373-74 (1989). However, we have suggested that supplementing an EA can be appropriate in light of significant new information. *Klein*, 753 F.3d at 584 (assuming without deciding that the same supplemental analysis standard for an EIS applies to an EA). The appellants state that two circumstances should have required the Forest Service to provide a Supplemental Impact Statement: (1) the North Country National Scenic Trail moving north and (2) the potential presence of a lynx on the land to be exchanged to the Deliches.

With regard to the North Country National Scenic Trail, the appellants claim that the Revised EA relied on the trail's original location adjacent to the Deliches' parcel of land to justify the land exchange. The appellants explain that the group responsible for this trail is moving it three miles away from the Deliches' land. The district court accurately described the Forest Service's response:

> [The Forest Service] prepared a Supplemental Information Report ("SIR"), a formal instrument for documenting whether new information is sufficiently significant to require a Supplemental Impact Statement. *See Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 555 (9th Cir. 2000). In the SIR, [the Forest Service] documented the interdisciplinary team's review of the new [Trail] information, and concluded that a supplement or revision of the Revised EA was not necessary because protection of the [Trail] was only one of several factors documented in the purpose and need statement for the land exchange, and because

> it was probable that a recreation trail (with or without [Trail] designation) would still remain at its current location on the boundary of the Deliches' parcel for the foreseeable future. [The Forest Service] concluded that relocation of the [T]rail does not present a seriously different picture with regard to the significance of environmental effects.

*Partners in Forestry*, 45 F. Supp. 3d at 690 (internal citation removed). The district court found that the Forest Service's Supplemental Impact Report indicated that it did consider the additional information and concluded that it did not rise to the level of "significant." We agree with the district court that the agency's decision was not arbitrary or capricious.

The appellants also assert that the Forest Service should have written a Supplemental Impact Statement when possible lynx tracks were found in a land parcel that would be exchanged with the Deliches. The district court's description of the Forest Service's response and its conclusion that supplementation was not needed is well-stated:

> Forest staff biologists investigated the unidentified tracks through additional tracking, trail cameras, and hair snares. No additional tracks or other evidence of the presence of a large cat was found in the area. [The Forest Service] also sent photographs of the tracks to biologists in the area, but there was no consensus among the experts regarding the species of cat that had made the tracks. Even if the tracks were made by lynx, there was no further evidence that the animal was still in the area. The Revised EA took into consideration that lynx, a very rare species that has not been sited on the Forest for nearly 50 years, may on occasion pass through the Forest, dispersing from their current range. Because the possibility that a lynx had passed through the area was consistent with the information contained in the Revised EA and the [FONSI], [the Forest Service] determined that the tracks did not present a seriously different picture with regard to the environmental effects of the project, and did not require supplementation of the Revised EA.

*Partners in Forestry*, 45 F. Supp. 3d at 690-91 (internal citations removed). The appellants have not demonstrated that the Forest Service acted arbitrarily or capriciously. Thus, we decline to find that it did.

**IV.**

Lastly, the appellants take issue with the district court's decision to strike excerpts of an appraisal from the administrative record. We review a district court's decision to exclude documents from the record for abuse of discretion. *See Latin Ams. for Soc. & Econ. Dev. v. Adm'r of Fed. Highway Admin.*, 756 F.3d 447, 475 (6th Cir. 2014). "An abuse of discretion exists when a reviewing court is firmly convinced that a mistake has been made." *Rorrer v. City of Stow*, 743 F.3d 1025, 1048 (6th Cir. 2014). It also exists when the agency "deliberately or negligently excludes certain documents, or when a court needs certain background information in order to determine whether the agency has considered all of the relevant factors." *Slater*, 120 F.3d at 638 (internal quotation marks removed). "Courts have suggested that in order to justify supplementation, a plaintiff must make a 'strong showing of bad faith.'" *Id.* (quoting *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996)).

The district court addressed the merits of submitting the appraisal:

> [The appellants] are not challenging the valuation of the property, so the Appraisal has little relevance to the issues on review. Although the Appraisal was cited in documents considered by the Forest Supervisor, there is no requirement that the administrative record include all underlying sources unless the report relies so heavily on the underlying sources that the agency might fairly be said to have considered the sources merely by considering the documents in which they were cited. *Sequoia Forestkeeper v. United States Forest Serv.*, No. 109CV00392, 2010 WL 2464857, at *6 (E.D. Cal. June 12, 2010). To the extent that the Appraisal is relevant to the issues on review, much of the information from the Appraisal is captured in other documents that are part of the Administrative Record. [The appellants] have not shown that the Appraisal conflicts with the Regional Review Appraisers' evaluations, or that it adds anything of significance to the information already contained in the Administrative Record. There is simply no suggestion that the Forest Service skewed the record by excluding information of great pertinence to this proceeding. *See Envtl. Def. Fund, Inc. v. Blum*, 458 F. Supp. 650, 661 (D.D.C. 1978). Although the Appraisal could arguably have been included in the Administrative Record, [the appellants] have not demonstrated that the Appraisal is necessary for adequate judicial review or that Defendant acted in bad faith in excluding it.

*Partners in Forestry*, 45 F. Supp. 3d at 682-83.  The appellants have not shown that the district court erred in this analysis.  Thus, the district court did not abuse its discretion by excluding the appraisal from the record.

## V.

The Forest Service did not act arbitrarily or capriciously in following NEPA's procedural requirements, and the district court properly struck the appraisal from the record.  Accordingly, we **AFFIRM** the judgment of the district court.